## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| JEFFERY FOLEY, JULIANNE GRIFFIN, RANDY REYES, and SHLONDA WHITE, individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>     v.<br><br>LEGACY HEALTH, THE BOARD OF DIRECTORS OF LEGACY HEALTH, and THE LEGACY HEALTH RETIREMENT COMMITTEE,<br><br>          Defendants. | CIVIL ACTION NO.: |

## <u>COMPLAINT</u>

Plaintiffs, Jeffery Foley, Julianne Griffin, Randy Reyes, and Shlonda White ("Plaintiffs"), by and through their attorneys, on behalf of the Legacy Health 403(b) Plan (the "403(b) Plan") and the Legacy Health Defined Contribution Retirement Plan[1] (collectively, the 403(b) Plan and the 401(a) Plan are referred to as the "Plans"),[2] themselves and all others similarly situated, state and allege as follows:

---

[1] Upon information and belief, the Legacy Health Defined Contribution Retirement Plan is also referred to as the Legacy Health 401(a) Matched Savings Plan. Hereinafter, the Legacy Health Defined Contribution Retirement Plan is referred to as the "401(a) Plan."

[2] The Plans are legal entities that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plans are not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plans and their participants.

## I.      INTRODUCTION

1.      This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciary, Legacy Health ("Legacy" or the "Company"), the Board of Directors of Legacy Health (the "Board"), and the Legacy Health Retirement Committee (the "Committee") (collectively, the Company, the Board, and the Committee, are referred to as the "Defendants") for breaches of its fiduciary duties.

2.      The Plans are defined contribution retirement plans, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enable eligible participants to make tax-deferred contributions from their salaries to the Plans. *See* Legacy Health Employee Retirement Guide 2023, Effective Jan. 1, 2023 ("SPD"), at 13 (the 403(b) Plan and 401(a) Plan identified in Glossary for Defined Contribution Plans.).

3.      To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009).

4.      The Department of Labor ("DOL") has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers."[3]; *see also Tibble v. Edison Int'l*,

---

[3] *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Sept. 2019), at 2, available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited July 24, 2024).

135 S. Ct. 1823, 1823 (2015) ("*Tibble I*") (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

5.    Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

6.    "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").

7.    Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

8.    The Supreme Court recently reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 741 (2022).

9.    Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plans, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached

the duties owed to the Plans, to Plaintiffs, and to the other participants of the Plans by, *inter alia*, failing to objectively and adequately review the Plans' investment portfolio, initially and on an ongoing basis, with due care to ensure that each investment option was prudent, in terms of performance.

10.    At all times during the Class Period, the Plans had combined, over one billion dollars in assets under management. At the start of the Class Period in 2019, the 403(b) Plan had $1,154,508,260 and the 401(a) Plan had $378,733,863 in assets under management. *See* 2019 Form 5500s for the 403(b) Plan and 401(a) Plan, Schedule H at 2.

11.    By 2023, the 403(b) Plan had $1,723,877,574 and the 403(b) Plan had $696,604,461 in assets under management. *See* 2023 Form 5500s for the 403(b) Plan and 401(a) Plan, Schedule H at 2. Collectively, the Plans had over $2.4 billion in assets under management in 2023.

12.    The Plans' assets under management qualifies them collectively as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States. In 2021, only 0.2 percent (1,011 of 641,747) of plans in the country had more than $1 billion in assets under management.[4] In addition, this was true at the start of the Class Period in 2019 where only 0.1 percent (776 of 603,217) of 401(k) plans in the country were as large as the Plans.[5]

13.    The Plans are also large in terms of the number of its participants. At the beginning of the Class Period, the 403(b) Plan had 16,194 participants and the 401(a) Plan had 12,474 participants. *See* 2019 Form 5500s for the 403(b) Plan and 401(a) Plan, at 2. By 2023, the 403(b)

---

[4]  *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2021 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2024-08/24-ppr-dcplan-profile-401k.pdf.

[5]  *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2019 at Ex. 1.2, p. 7, available at https://www.ici.org/system/files/2022-09/22-ppr-dcplan-profile-401k.pdf.

Plan had 19,176 participants and the 401(a) Plan had 14,034 participants. *See* 2023 Form 5500s for the 403(b) Plan and 401(a) Plan, at 2. Collectively, the Plans had 33,210 participants in 2023. For comparison, according to information derived from ERISApedia.com's database, a service that compiles all Form 5500s filed with the Dept. of Labor ("DOL") by retirement plans, in 2020, there were only 198 defined contribution plans (401k, 401a, and 403b) in the country with between 15,000 and 19,999 participants with account balances. Additionally, there were only 90 retirement plans with between 30,000 and 39,999 participants.

14.    With regard to the Plans' investments, Defendants breached their fiduciary duty of prudence by selecting and/or maintaining guaranteed investment contracts ("GIC") in the Plans with lower crediting rates compared to available similar or identical investments with higher crediting rates, both within the 403(b) Plan and outside of the Plans. The crediting rate is the guaranteed rate of return for the investment fund.

15.    Among other imprudent investments, Defendants allowed substantial assets in the Plans to be invested in a separate account GIC with Lincoln National Life Insurance Company (the Lincoln Stable Value Separate Account GIC (the "LSA GIC")), that provided significantly lower rates of return than comparable stable value funds that Defendants could have made available to Plan participants, including in a traditional annuity contract, the Lincoln Fixed Account GIC (the "LFA GIC"), in the 403(b) Plan.

16.    A prudent fiduciary would not have included this underperforming investment option that also carried significantly more risk than other investment options that had similar goals, *i.e.,* preservation of investment assets.

17.    Lincoln benefited significantly from participants in the Plans investing in the LSA GIC. A prudent fiduciary who adequately monitored the Plans' investments and placed the

interests of participants in the Plans above all would have recognized that the LSA GIC was benefitting Lincoln at the expense of the participants in the Plans. The investments in the LSA GIC were held and invested by Lincoln, which kept the spread (the difference between the amount it earned on the investment and the amount it paid to the Plans' participants). The crediting rates that Lincoln provided to the Plans were and are so low that Lincoln reaped a windfall on the spread.

18.    Additionally, the Plans' fiduciaries selected and failed to remove the underperforming T.Rowe Price Growth Stock fund whose investment returns significantly underperformed relevant benchmarks costing the Plans and participants millions of dollars in losses.

19.    Plaintiffs also allege that Defendants breached the duties they owed to the 401(a) Plan, to Plaintiffs, and to the other participants of the 401(a) Plan by failing to defray[] reasonable expenses of administering the [Plan]. 29 U.S.C. § 1104(a)(A)(ii). Their failure stems from the use of Plan participant forfeited funds to reduce Company contributions to the 401(a) Plan instead of using the funds to reduce or eliminate the amounts charged to Plan participants for 401(a) Plan administrative costs. This action by the Company was a clear breach of the duties of prudence and loyalty to Plan participants and cost Plan participants millions of dollars.

20.    During the putative Class Period, Defendants, as "fiduciaries" of the Plans, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties owed to the Plans, to Plaintiffs, and to the other participants of the Plans by, *inter alia*: (1) failing to objectively and adequately review the Plans' investment portfolio with due care to ensure that each investment option was prudent, in terms of cost and performance; and (2) failing to defray reasonable expenses of administering the 401(a) Plan.

21.     Defendants' mismanagement of the Plans, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plans and their participants millions of dollars.

22.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count I), breach of the fiduciary duty of loyalty (Count II), breach of ERISA's Anti-Inurement Provision (Count III), and failure to monitor fiduciaries (Count IV).

## II.     JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

24.     This Court has personal jurisdiction over Defendants because the Plans are administered in this District meaning Legacy transacts business in this District, resides in this District, and/or has significant contacts with this District, and because ERISA provides for nationwide service of process.

25.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Legacy does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.    PARTIES

### Plaintiffs

26.    Plaintiff, Jeffrey Foley ("Foley"), resides in Portland, Oregon. During his employment, Plaintiff Foley participated in the 403(b) Plan. Mr. Foley invested in the LSA GIC in the 403(b) Plan and suffered injury to his 403(b) Plan account due to the significant underperformance of the LSA GIC. Plaintiff Foley also participated in the 401(a) Plan. Mr. Foley invested in the LSA GIC and T. Rowe Price Growth Stock fund in the 401(a) Plan and suffered injury to his 401(a) Plan account due to the significant underperformance of the LSA GIC and T. Rowe Price Growth Stock. Plaintiff Foley also suffered injury due to the fact that Defendants failed to use forfeited Plan funds to pay 401(a) Plan administrative expenses which, if used to pay for administrative expenses, would have reduced or eliminated the amounts charged to Plaintiff Foley's individual account.

27.    Plaintiff, Julianne Griffin ("Griffin"), resides in West Linn, Oregon. During her employment, Plaintiff Griffin participated in the 401(a) Plan. Plaintiff Griffin suffered injury due to the fact that Defendants failed to use forfeited Plan funds to pay 401(a) Plan administrative expenses which, if used to pay for administrative expenses, would have reduced or eliminated the amounts charged to Plaintiff Griffin's individual account.

28.    Plaintiff, Randy Reyes ("Reyes"), resides in Portland, Oregon. During his employment, Plaintiff Reyes participated in the 401(a) Plan. Plaintiff Reyes suffered injury due to the fact that Defendants failed to use forfeited Plan funds to pay 401(a) Plan administrative expenses which, if used to pay for administrative expenses, would have reduced or eliminated the amounts charged to Plaintiff Reyes's individual account.

29.     Plaintiff, Shlonda White ("White"), resides in Portland, Oregon. During her employment, Plaintiff White participated in the 401(a) Plan. Plaintiff White suffered injury due to the fact that Defendants failed to use forfeited Plan funds to pay 401(a) Plan administrative expenses which, if used to pay for administrative expenses, would have reduced or eliminated the amounts charged to Plaintiff White's individual account.

30.     Plaintiffs have standing to bring this action on behalf of the Plans because they participated in the Plans and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duties as described herein.

31.     Further, each of the Plaintiffs have standing to bring this action on behalf of the Plans even if they only participated in one of the Plans because "[a]n individual in one ERISA benefit plan can represent a class of participants in numerous plans other than his own, if the gravamen of the plaintiff's challenge is to the general practices which affect all of the plans." *Fallick v. Nationwide Mutual Ins. Co.,* 162 F.3d 410, 422 (6th Cir. 1998); *see also Dann v. Lincoln Natl. Corp., et al.*, 708 F.Supp.2d 481, 487 (E.D. Pa. 2010); *Mulder v. PCS Health Sys., Inc.*, 216 F.R.D. 307, 317 (D.N.J. 2003) ("Mulder has standing to pursue his claims on behalf of members of other employee benefit plans included in the definition of the class.").

32.     Here, the Plans were sponsored by the Company and administered in the same manner, including having the LSA GIC as an investment option.

33.     Plaintiffs did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

9

**Defendants**

*Company Defendant*

34.    Legacy Health is the sponsor of the Plans and a named fiduciary of the Plans with a principal place of business at 1919 NW Lovejoy Street, Portland, Oregon. *See* 2023 Form 5500s for the 403(b) Plan and 401(a) Plan, at 1; see also Legacy Health Retirement Committee Charter ("Committee Charter"), at 1 ("Under the terms of the Plans, the Company is the 'Plan Administrator' of the Plans, as defined in Section 3 (16) of ERISA, and the **'Named Fiduciary'** of the Plans, as defined in Section 402(a) of ERISA."). Legacy "is a local, nonprofit, six-medical center health system that also includes more than 80 primary care, specialty and urgent care clinics; over 14,000 employees and more than 3,000 health care providers."[6]

35.    The Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A). Legacy, directly or by acting through its Board, appointed the Committee.

36.    Further, at all times, Legacy acted through its officers to perform Plan-related fiduciary functions. These officers were acting in the course and scope of their employment.

37.    Accordingly, during the putative Class Period, Legacy is/was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

*Board Defendants*

38.    "The Plans authorize the Board of Directors of the Company (the **"Board")** to delegate the Company's responsibilities as Plan Administrator and Named Fiduciary to one or

---

[6] *See* https://www.legacyhealth.org/-/media/Files/PDF/Our-Legacy/AboutLegacy/Legacy-Health-Profile.pdf, last accessed on April 10, 2025.

more individuals or committees to provide for the proper and efficient administration of the Plans."
Committee Charter, at 1.

39.    Accordingly, each member of the Board during the putative Class Period (referred
to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section
3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty to monitor the actions of the
Committee.

40.    The Board and the unnamed members of the Board during the Class Period
(referred to herein as John Does 1-10), are collectively referred to herein as the "Board
Defendants."

### Committee Defendants

41.    The Committee administered the Plans and served as a Named Fiduciary of the
Plans within the meaning of Section 402(a)(2) of ERISA. *See* Committee Charter, at 1 ("[T]he
Board establish[d] and appoint[ed] the Legacy Health Retirement Committee **("Retirement
Committee")** to provide for the proper operation, administration, and maintenance of the Plans.").

42.    "The Board has delegated to the Retirement Committee the full power, authority
and responsibilities of the Plan Administrator and the Named Fiduciary under ERISA with respect
to the day-to-day operation and administration of the Plans." *Id*., at 2.

43.    "The Board has delegated to the Retirement Committee the full power, authority
and responsibility of the Plan Administrator and Named Fiduciary under ERISA with respect to
the investment of assets under the Plans, including the selection and monitoring of the investment
options and fund managers of each Plan." *Id*., at 3.

44.    Each member of the Committee during the putative Class Period (referred to herein
as John Does 11-20) is/was a fiduciary of the Plans, within the meaning of ERISA Section

3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period, because each had control over plan management and/or authority or control over management or disposition of plan assets.

45.    Members of the Committee during the Class Period are collectively referred to herein (referred to herein as John Does 11-20) as the "Committee Defendants."

## IV.    CLASS ACTION ALLEGATIONS[7]

46.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and the following proposed class ("Class"):

> All persons, except Defendants and any fiduciary of the Plans and their immediate family members, who were participants in or beneficiaries of the Legacy Health 403(b) Plan and the Legacy Health Defined Contribution Retirement Plan at any time between June 17, 2025 to the date of judgment (the "Class Period").[8]

47.    The members of the Class are so numerous that joinder of all members is impractical. The 2023 403(b) Form 5500 lists 19,176 "participants with account balances as of the end of the plan year." 2023 403(b) Form 5500, at 2. The 2023 401(a) Form 5500 lists 14,034 "participants with account balances as of the end of the plan year." 2023 401(a) Form 5500, at 2.

48.    Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plans and have suffered injuries as a result of Defendants' mismanagement of the Plans. Defendants treated Plaintiffs consistently with other Class members, and managed the Plans as a single entity. Plaintiffs' claims and the claims of all

---

[7] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plans because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plans and all participants. *See, e.g.*, *In re: Wilmington Trust Corp.*, 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[8] Plaintiffs reserve their right to seek modification of the close of the Class Period in the event that further investigation/discovery reveals a more appropriate end period.

Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

49.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A.     Whether Defendants are fiduciaries of the Plans;

B.     Whether Defendants breached their fiduciary duties of prudence and loyalty by engaging in the conduct described herein;

C.     The proper form of equitable and injunctive relief; and

D.     The proper measure of monetary relief.

50.     Plaintiffs will fairly and adequately represent the Class, and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action, and anticipate no difficulty in the management of this litigation as a class action.

51.     This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of

other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

52.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.     THE PLANS

### A.     The 403(b) Plan

53.     The 403(b) Plan is a "defined contribution profit sharing plan." Legacy Health 403(b) Plan, Amended and Restated Effective January 1, 2016 ("403(b) Plan Doc."), at 1.

### *Eligibility*

54.     Employees of Legacy generally are eligible to participate in the 403(b) Plan and "to make elective deferrals . . . beginning on the first regularly scheduled pay date after the employee becomes an eligible employee." *Id.*, at 7.

55.     The 403(b) Plan includes an automatic enrollment feature. "The automatic enrollment date is the first pay date that is at least *90 days* after the date the employee first has an Hour of Service as an eligible employee." *Id.*, at 9.

### *Contributions*

56.     "Each eligible employee who is a Participant may elect to defer a percentage of Compensation." *Id.*, at 7.

57.     The 403(b) Plan includes an automatic deferral feature. "If an eligible employee does not make an affirmative election . . . before the automatic enrollment date, the employee's Compensation shall be automatically reduced by . . . 4 percent of Compensation." *Id.*, at 8-9.

### *Vesting*

58.     Participants are fully vested in their contributions to the 403(b) Plan. *See* SPD, at 4 ("You are always 100% vested.").

### *GICs in the 403(b) Plan*

59.     Included in the 403(b) Plan's available funds were guaranteed investment contracts that consist of the Lincoln Stable Value Separate Account (previously defined as the "LSA GIC") and the Lincoln Financial Fixed Account (previously defined as the "LFA GIC").

60.     At the end of 2019, $76,740,029 in 403(b) Plan assets were invested in the LSA GIC, and $1,845,750 in 403(b) Plan assets were invested in the LFA GIC. *See* Schedule of Assets (Held at the end of Year) as of December 31, 2019, attached to 2019 403(b) Form 5500, at 13.

61.     By the end of 2023, over $92 million in 403(b) Plan assets were invested in the LSA GIC, and $1,563,194 were invested the LFA GIC. *See* Schedule of Assets (Held at the end of Year) as of December 31, 2023, attached to 2023 403(b) Form 5500, at 16.

62.     The chart below demonstrates the amount of 403(b) Plan assets invested in the GICs during the Class Period.

| Plan Year | 403(b) Plan Assets in LSA GIC | 403(b) Plan Assets in LFA GIC |
|---|---|---|
| 2019 | $76,740,029 | $1,845,750 |
| 2020 | $90,685,549 | $1,793,296 |
| 2021 | $88,743,323 | $1,644,964 |
| 2022 | $101,148,315 | $1,654,484 |
| 2023 | $92,669,656 | $1,563,184 |

### B.     The 401(a) Plan

63.     The 401(a) Plan "is a noncontributory defined contribution plan." Report of Independent Auditors attached to 401(a) 2023 Form 5500, at 8.

### GICs in the 403(b) Plan

64.    Included in the 401(a) Plan's available funds was the LSA GIC.

65.    At the end of 2019, $18,628,281 in 401(a) Plan assets were invested in the LSA GIC. *See* Schedule of Assets (Held at the end of Year) as of December 31, 2019, attached to 2019 401(a) Form 5500, at 12.

66.    By the end of 2023, over $28 million in 401(a) Plan assets were invested in the LSA GIC. *See* Schedule of Assets (Held at the end of Year) as of December 31, 2023, attached to 2023 401(a) Form 5500, at 16.

67.    The chart below demonstrates the amount of 401(a) Plan assets invested in the GICs during the Class Period.

| Plan Year | 401(a) Plan Assets in LSA GIC |
|-----------|-------------------------------|
| 2019 | $18,628,281 |
| 2020 | $23,318,256 |
| 2021 | $23,217,037 |
| 2022 | $27,134,351 |
| 2023 | $28,113,273 |

### Eligibility

68.    Employees are generally eligible to receive employer matching contributions[9] in the 401(a) Plan "on the first day of the month on or after the date the employee is at least age 21 and has completed one Year of Service." Legacy Health Defined Contribution Retirement Plan 2021 Restatement, Effective January 1, 2021 ("401(a) Plan Doc."), at 3.

---

[9] Employees are generally eligible to receive employer nonelective contributions "on the first day of the month on or after the date the employee becomes a Qualified Employee and has reached age 21." 401(a) Plan Doc., at 4.

*Contributions*

69.     "Employer shall make a matching contribution for [employees]:

(a)     Matchable 403(b) contributions above five percent (5%) of an employee's compensation for a year shall be disregarded for purposes of matching for the year.

(b)     For employees with fewer than ten (10) Years of Service, the matching contribution rate shall be fifty percent (50%) of the employee's Matchable 403(b) contributions for the year.

(c)     For employees with between 10 and fifteen (15) Years of Service, the matching contribution rate shall be sixty percent (60%) of the employee's Matchable 403(b) contributions for the year.

(d)     For employees with at least 16 Years of Service, the matching contribution rate shall be seventy percent (70 %) of the employee's Matchable 403(b) contributions for the year."

401(a) Plan Doc., at 12-13.

70.     Legacy "shall make a nonelective contribution for its [employees]." *Id*. at 16.

71.     "The amount of an eligible participant's nonelective contribution for each plan year shall be a percentage of the participant's compensation for the plan year, . . . . The percentage used to calculate a participant's nonelective contribution for a plan year shall be based on the number of the participant's Years of Service . . . as shown on the following table:

| Nonelective Years of Service | Contribution Percentage |
|---|---|
| Fewer than 6 | 2.5% |
| At least 6 but fewer than 11 | 4% |
| At least 11 but fewer than 16 | 5% |
| At least 16 but fewer than 21 | 6% |
| 21 or more | 7% |

*Id*., at 17.

### *Vesting*

72.    "Amounts attributable to Employer matching contributions . . . shall be vested as follows, . . . :

| Years of Service | Percent Vested |
|:---:|:---:|
| Less than 1 | 0% |
| 1 | 20% |
| 2 | 40% |
| 3 | 60% |
| 4 | 80% |
| 5 or more | 100% |

*Id.*, at 23

73.    Amounts attributable to Employer nonelective contributions . . . shall be vested as follows,  . . .:

| Years of Service | Percent Vested |
|:---:|:---:|
| Less than 3 | 0% |
| 3 or more | 100% |

*Id.*, at 24.

### *Forfeitures*

74.    "The unvested portion of a participant's account(s) shall be forfeited at the earlier of … : (a) The date on which the participant's vested interest in his or her accounts has been fully distributed. For this purpose, a participant who has no vested interest under the plan will be deemed to have received a complete distribution of his or her accounts under the plan on severance from employment[; or] (b) The date on which the participant has had five consecutive One- Year Breaks in Service." *Id.*, at 24.

75.    "Forfeitures shall first be applied to restore prior forfeitures." *Id*.

76.    "Any forfeitures remaining . . .  shall be applied to reduce future Employer contributions or to pay plan expenses." *Id*.

77.    "With respect to all of each Plan that is subject to Title I of ERISA, the Committee shall administer each such Plan: a. solely in the interest of the Plan participant and beneficiaries; [and] b. for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying the reasonable expenses of administering the plans; ..." Committee Charter, at 3.

## VI.    THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATES THAT DEFENDANTS FAILED TO ADMINISTER THE PLAN IN A PRUDENT MANNER

### A.    ERISA Fiduciaries Are Held to the Highest Standards Regarding Process and Methodology of Evaluating Investments

78.    As described in the "Parties" section above, Defendants were fiduciaries of the Plans.

79.    ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exist "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S. Ct. at 741.

80.    As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. ..." DOL 408(b)(2) Regulation Fact Sheet.

81.    The duty "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[10]

82.    Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

83.    A prudent investment professional, and hence a fiduciary, must regularly evaluate a fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

84.    With respect to investment returns, diligent investment professionals monitor the performance of their selected investments using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

85.    The measurement of investments against prudently managed alternatives is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

---

[10] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain.

86.     Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

87.     It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S. Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.").

88.     To the extent plan fiduciaries have adopted an investment policy statement, those fiduciaries "must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Lauderdale v. NFP Retirement, Inc.*, 2022 WL 17260510, at * 10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

89.     Plaintiff did not have and does not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plan's investments because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

90.     Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases, even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of

a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

91.    For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes and methods based upon several factors as described below.

92.    Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the selection (and maintenance) of the LSA GIC in the Plans throughout the Class Period that wasted the assets of the Plans and the assets of participants because of unnecessary costs and underperformance.

**B.    Defendants Breached Their Fiduciary Duties by Causing the Plans to Offer the LSA GIC**

**1.    Overview of GICs**

93.    For defined-contribution retirement plans, stable value investments are intended to provide participants with an option that protects their assets and is shielded from risks of loss, hence why they are called Guaranteed Investment Contracts or GICs.

94.    GICs are issued by insurance companies in the form of a fixed annuity contract. Pursuant to the terms of those contracts, the GICs provide for a guaranteed rate of return or "crediting rate" during a specified period.

95.    There are several different types of stable value investments in the retirement plan marketplace. Large plans often offer "synthetic" stable value funds, which are the least risky,

because principal is guaranteed by multiple "wrap providers" and the fund owns the assets of the underlying funds.

96.    Separate account products, where the assets of the underlying funds are held in the separate account of an insurance carrier are riskier, because there is only one "wrap" provider. For separate account GICs, the insurer's payment obligations are putatively backed by a separate account, which is less susceptible to claims and liabilities against the insurer. As a result, separate account GICs offer higher crediting rates.

97.    And General account products, such as the LSA GIC, where the funds are held unrestricted in the general account of the insurance carrier, are the riskiest type of stable value funds, because they are more vulnerable to single entity credit risk and are riskier than separate account GICs. Consequently, general account GICs offer the highest rates.

98.    Because the funds are kept in unrestricted accounts, they are generally subject to claims and liabilities asserted against the insurer. Such funds are subject to single entity credit risk, meaning the insurer is the sole entity responsible for paying such funds. If the insurer fails to pay funds, no other entity will satisfy the loan.

### 2.    The Plans Inclusion of the LSA GIC

99.    At all relevant times, Defendants maintained the authority to exercise control over the Plans' investments, including the Plans' LSA GIC.

100.    Lincoln establishes the crediting rates for its GIC with the Plans. Lincoln "is contractually obligated to repay the principal and a specified interest rate that is guaranteed to the Plan. The crediting rate is based on a formula established by the contract issuer but may not be less than 1%. The crediting rate is reviewed on a semi-annual basis for resetting." 403(b) Auditor's Report, at 12; 401(a) Auditor's Report, at 12.

101.    Lincoln earns a "spread" equal to the difference between the crediting rate and the returns Lincoln earns on the funds in its general accounts.

### 3.    There are Many GICs in the Marketplace with Competitive Crediting Rates

102.    The marketplace for GICs is robust with many insurance companies offering GICs with competitive rates.

103.    Throughout the Class Period, identical or substantially identical stable value funds with higher crediting rates, and hence lower spreads, were available to the Plans, but were not selected by Defendants.

104.    The LSA GIC in the Plans is a general account product that should have had a high crediting rate given its riskiness, yet it had underwhelming crediting rates when compared against GICs with similar or lower riskiness provided by other comparable carriers for other retirement plans:

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate[11] |
|------|-----------|---------------------|-------------|-------------------|-----------------|
| **2019** | Baylor College of Medicine Retirement Plan | 12,587 | $1,278,730,175 | Lincoln Financial Group | 4.29% |
| | Jackson National Life Insurance Company Defined Contribution Plan | 5,002 | $1,090,110,381 | Jackson National Life Insurance | 4.28% |
| | Holzer Health System | 1,896 | $179,609,420 | American United Life Insurance Company | 3.98% |

[11] For crediting rates not identified in the plans' Form 5500s, the calculated yield is interest credited divided by the end of year balance.

| | | | | |
|---|---|---|---|---|
| | 401(a) Profit Sharing Plan | | | | |
| | Transamerica 401(k) Retirement Savings Plan | 15,140 | $2,020,965,905 | Transamerica Financial Life Insurance Company | 3.85% |
| | American United Life Progress Sharing Plan and Trust | 3,051 | $377,919,056 | American United Life Insurance Company | 3.70% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,515 | $355,957,124 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | **Legacy 403(b) Plan** | **16,194** | **$1,154,508,260** | **LSA GIC** | **2.41%** |
| | **Legacy 401(a) Plan** | **12,474** | **$378,733,863** | **LSA GIC** | **2.36%** |
| | | | | | |
| 2020 | Baylor College of Medicine Retirement Plan | 12,905 | $1,493,377,139 | Lincoln Financial Group | 4.16% |
| | Alina 401(k) Retirement Savings Plan | 32,203 | $2,690,046,457 | Brighthouse Life Insurance Company | 3.72% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,711 | $428,308,461 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | American United Life Progress Sharing Plan and Trust | 2,699 | $435,970,029 | American United Life Insurance Company | 3.54% |
| | **Legacy 403(b) Plan** | **16,611** | **$1,392,079,537** | **LSA GIC** | **2.06%** |

| | | | | | |
|---|---|---|---|---|---|
| | **Legacy 401(a) Plan** | **12,817** | **$501,061,430** | **LSA GIC** | **2.06%** |
| 2021 | Gemba Group Annuity Plan | 969 | $118,565,852 | National Ohio Financial Services | 4.97% |
| | Baylor College of Medicine Retirement Plan | 13,391 | $1,692,013,731 | Lincoln Financial Group | 4.23% |
| | Holzer Health System 401(a) Profit Sharing Plan | 2,017 | $203,815,263 | American United Life Insurance Company | 4.02% |
| | American United Life Progress Sharing Plan and Trust | 3,183 | $493,267,284 | American United Life Insurance Company | 3.87% |
| | Gemba Group Annuity Plan | 969 | $118,565,852 | Principal Life Insurance Company | 3.84% |
| | **Legacy 403(b) Plan** | **17,185** | **$1,634,638,164** | **LSA GIC** | **2.22%** |
| | **Legacy 401(a) Plan** | **13,039** | **$606,253,131** | **LSA GIC** | **2.24%** |
| 2022 | International Imaging Materials Inc. Retirement and Investment Plan | 445 | $59,443,888 | Lincoln National Life Insurance Co. | 4.89% |
| | Baylor College of Medicine Retirement Plan | 14,036 | $1,434,738,254 | Lincoln Financial Group | 4.37% |

| | | | | | |
|---|---|---|---|---|---|
| | American United Life Progress Sharing Plan and Trust | 3,235 | $439,262,320 | American United Life Insurance Company | 3.90% |
| | Jackson National Life Insurance Company Defined Contribution Plan | 4,650 | $1,149,061,601 | Jackson National Life Insurance | 3.83% |
| | Alina 401(k) Retirement Savings Plan | 34,554 | $2,678,277,538 | Brighthouse Life Insurance Company | 3.69% |
| | Trugreen Profit Sharing and Retirement Plan | 11,408 | $371,495,784 | Massachusetts Mutual Life Insurance Company | 3.67% |
| | **Legacy 403(b) Plan** | **18,346** | **$1,423,656,998** | **LSA GIC** | **1.76%** |
| | **Legacy 401(a) Plan** | **13,167** | **$556,921,709** | **LSA GIC** | **1.72%** |
| 2023 | Valley Hospital Retirement Defined Contribution Plan | 4,282 | $550,230,744 | Lincoln National Life Insurance Co. | 4.57% |
| | Mattel, Inc. Personal Investment Plan | 7,427 | $1,167,576,000 | Metropolitan Tower Life Insurance Co. | 3.71% |
| | Pomona Valley Hospital Medical Center Retirement Savings Plan | 4,219 | $525,201,271 | Lincoln National Life Insurance Co. | 3.64% |

| | Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Life Insurance Company | 3.48% |
|---|---|---|---|---|---|
| | **Legacy 403(b) Plan** | **19,176** | **$1,723,877,574** | **LSA GIC** | **2.12%** |
| | **Legacy 401(a) Plan** | **14,034** | **$696,604,461** | **LSA GIC** | **1.99%** |

105.    Throughout the Class Period, the LSA GIC in the 403(b) Plan underperformed the comparator funds by an average of over 46%, and the LSA GIC in the 401(a) Plan underperformed the comparator funds by an average of over 47%, as demonstrated in the table below.

| Year | LSA GIC Rate of Return in 403(b) Plan | LSA GIC Rate of Return in 401(a) Plan | Comparator Average Rate of Return | LSA GIC Percentage of Underperformance in 403(b) Plan | LSA GIC Percentage of Underperformance in 401(a) Plan |
|---|---|---|---|---|---|
| 2019 | 2.41% | 2.36% | 3.94% | 38.83% | 40.10% |
| 2020 | 2.06% | 2.06% | 3.75% | 45.07% | 45.07% |
| 2021 | 2.22% | 2.24% | 4.19% | 47.02% | 46.54% |
| 2022 | 1.76% | 1.72% | 4.06% | 56.65% | 57.64% |
| 2023 | 2.12% | 1.99% | 3.85% | 44.94% | 48.31% |
| **Average Underperformance during Class Period** | | | | **46.50%** | **47.53%** |

106.    In short, because the Plans held between $1.5 billion and $2.4 billion combined in assets under management throughout the Class Period, they had considerable leverage to bargain for higher crediting rates.

### 4.    The Alternate GIC (the LFA GIC) in the 403(b) Plan Outperformed the LSA GIC

107.    Even more compelling evidence that the LSA GIC was an imprudent investment option in the Plans is the fact that the alternative GIC in the 403(b) Plan had substantially higher crediting rates than the LSA GIC, as demonstrated in the chart below.

28

| Year | LSA GIC Rate of Return in 403(b) Plan | LSA GIC Rate of Return in 401(a) Plan | LFA GIC Rate of Return in 403(b) Plan |
|---|---|---|---|
| 2019 | 2.41% | 2.36% | 3.54% |
| 2020 | 2.06% | 2.06% | 3.56% |
| 2021 | 2.22% | 2.24% | 3.36% |
| 2022 | 1.76% | 1.72% | 3.55% |
| 2023 | 2.12% | 1.99% | 3.67% |

108.    However, and despite the disparity in crediting rates, assets of the 403(b) Plan invested in the LSA GIC were substantially higher than assets in the LFA GIC.

| Plan Year | 403(b) Plan Assets in LSA GIC | 403(b) Plan Assets in LFA GIC |
|---|---|---|
| 2019 | $76,740,029 | $1,845,750 |
| 2020 | $90,685,549 | $1,793,296 |
| 2021 | $88,743,323 | $1,644,964 |
| 2022 | $101,148,315 | $1,654,484 |
| 2023 | $92,669,656 | $1,563,184 |

109.    A prudent fiduciary would have known that other providers of fixed annuities offer substantially identical, better-performing stable value investments. A prudent fiduciary would have accomplished this goal by demanding higher crediting rates from Lincoln and/or by submitting requests for proposals to Lincoln and other providers of stable value investments.

110.    By selecting the LSA GIC with underperforming crediting rates, Defendants provided participants with investment options that failed to maximize the value of their investments.

111.    With the massive amount of assets under management in the LSA GIC, the losses suffered by Plan participants were devastating. Every additional expense imposed upon the participants compounds and reduces the value of their retirement savings over time. *Tibble v.*

*Edison Int'l*, 575 U.S. 523, 525 (2015). For example, a 1% higher fee over 35 years makes a 28% difference in retirement assets at the end of a participant's career.[12]

### C.    The T. Rowe Price Growth Stock Fund in the Plans

112.    At all relevant times, Defendants maintained the authority to exercise control over the Plans' investments, including the Plans' T. Rowe Price Growth Stock.

113.    At the start of the Class Period the Plans combined held more than $50 million in the T. Rowe Price Growth Fund. By 2021, the amount invested had reached $78 million. The table below demonstrates the amount of Plan assets in the T. Rowe Price Growth Stock fund.

| Plan Year | Assets in T. Rowe Price Growth Stock in 403(b) Plan | Assets in T. Rowe Price Growth Stock in 401(a) Plan |
|---|---|---|
| 2019 | $41,433,733 | $8,887,636 |
| 2020 | $52,703,351 | $12,859,535 |
| 2021 | $63,078,216 | $15,731,738 |
| 2022 | $37,917,492 | $9,923,441 |
| 2023 | N/A | N/A |

114.    With such a large amount invested in the T. Rowe Price Growth Stock, the Plans would have been able to choose virtually any available Large Growth fund for the Plans by the start of the Class Period.

115.    Defendants, in particular, the Committee, were obligated under ERISA to carefully evaluate the T. Rowe Price Growth Stock before selecting it for inclusion in the Plans. The Committee was also under a continuing obligation under ERISA to carefully monitor and scrutinize the performance of the T. Rowe Price Growth Stock on an ongoing basis thereafter.

---

[12] Look at 401(k) Plan Fees, UNITED STATES DEPT. OF LABOR at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource center/publications/401k-plan-fees.pdf (accessed Feb. 14, 2025).

1.    **The Plans' Fidcuiaries Failed to Adequately Monitor and Timely Remove the T. Rowe Price Growth Stock Fund**

   a.    **The T. Rowe Price Growth Stock Fund Significantly Underperformed Its Peers and Benchmarks**

116.    Prior to the start of the Class Period, the T. Rowe Price Growth Stock underperformed its peers and its Russell 1000 Growth Index benchmark.[13] Since at least 2015 the T. Rowe Price Growth Stock consistently underperformed on a 3- and 5- year average basis.

117.    The T. Rowe Price Growth Stock consistently materially underperformed its benchmark. Based on the data, there's no justifiable reason why this fund would have been selected for the Plan or would have been permitted to continue to languish in the Plan, unheeded, during the Class Period.

118.    As seen in the chart below, the T. Rowe Price Growth Stock underperformed compared to its Russell 1000 Growth Index on a 3- and 5-year average basis before the start of the Class Period and continued to underperform throughout the Class Period.

119.    Given the long history of underperformance, it's inexplicable why the T. Rowe Price Growth Stock would have been included as a Plan investment option by the start of the Class Period and kept in place.

120.    In the chart below, the T. Rowe Price Growth Stock Fund (highlighted in yellow), consistently underperformed compared to its comparator funds (in red text) and its Russell 1000 Growth Index benchmark (in bold) on a 3-year average basis at the start of the Class Period and

---

[13] The Legacy Health Defined Contribution Retirement Plan Investment Policy states that the Committee shall review the performance of investment funds' performances against the benchmark index assigned to the fund. The T. Rowe Price Growth Stock Fund's strategy benchmark is the Russell 1000 Growth Index. *See* T. Rowe Price March 1, 2025 Prospectus for the Growth Stock Fund, at 6 ("Strategy Benchmark(s) Russell 1000 Growth Index."), attached as Exhibit A.

continued to underperform throughout the Class Period. In fact, the chart below demonstrates that, in 2019 and continuing through 2024, the T. Rowe Price Growth Stock Fund underperformed against the comparator funds 30 out of 30 instances (100%).

| Investment and Benchmark | Three-Year Return (Annualized) | | | | | |
|---|---|---|---|---|---|---|
| | 1/1/2017 - 12/31/2019 | 1/1/2018 - 12/31/2020 | 1/1/2019 - 12/31/2021 | 1/1/2020 - 12/31/2022 | 1/1/2021 - 12/31/2023 | 1/1/2022 - 12/31/2024 |
| T. Rowe Price Growth Stock Fund | 20.05 | 21.03 | 29.07 | -0.54 | 1.44 | 4.06 |
| | | | | | | |
| Fidelity Blue Chip Growth K | 22.55 | 29.94 | 38.62 | 7.1 | 5.62 | 10.28 |
| Fidelity Growth Company Fund | 21.81 | 30.33 | 41.69 | 10.81 | 6.15 | 10.18 |
| Alger Focus Equity Y | 22.38 | 25.89 | 33.05 | 4.08 | 3.74 | 12.3 |
| JPMorgan Large Cap Growth R6 | 24.71 | 29.91 | 37.33 | 11.59 | 6.23 | 10.63 |
| Marsico Focus Institutional | 21.21 | 25.88 | 33.57 | 6.44 | 5.38 | 11.2 |
| | | | | | | |
| Benchmark: Russell 1000 Growth Index | 20.49 | 22.99 | 34.08 | 7.79 | 8.86 | 10.47 |

121.    Further, the chart above demonstrates that the T. Rowe Price Growth Stock Fund underperformed its Russell 1000 Growth Index benchmark on a 3-year average basis since before the start of the Class Period and continued to underperform throughout the Class Period. More specifically, T. Rowe Price Growth Stock Fund underperformed against the Russell 1000 Growth Index benchmark on a 3-year average basis in *every instance* in 2019, 2020, 2021, 2022, 2023 and 2024.

122.    In the chart below, the T. Rowe Price Growth Stock Fund (highlighted in yellow), consistently underperformed compared to its comparator funds (in red text) and its Russell 1000 Growth Index benchmark (in bold) on a 5-year average basis at the start of the Class Period and continued to underperform throughout the Class Period. In fact, the chart below demonstrates that,

in 2019 and continuing through 2024, the T. Rowe Price Growth Stock Fund underperformed against the comparator funds 29 out of 30 instances (96.67%).

| | Five-Year Return (Annualized) | | | | | |
|---|---|---|---|---|---|---|
| Investment and Benchmark | 1/1/2015 - 12/31/2019 | 1/1/2016 - 12/31/2020 | 1/1/2017 - 12/31/2021 | 1/1/2018 - 12/31/2022 | 1/1/2019 - 12/31/2023 | 1/1/2020 - 12/31/2024 |
| T. Rowe Price Growth Stock Fund | 14.23 | 19.16 | 23.25 | 4.96 | 13.33 | 13.12 |
| | | | | | | |
| Fidelity Blue Chip Growth K | 14.77 | 24.9 | 29.7 | 10.66 | 20.64 | 21.75 |
| Fidelity Growth Company Fund | 15.62 | 26.27 | 30.01 | 15.45 | 22.63 | 22.41 |
| Alger Focus Equity Y | 14.68 | 22.04 | 26.31 | 9.01 | 16.98 | 19.96 |
| JPMorgan Large Cap Growth R6 | 15.52 | 24.42 | 29.23 | 14.27 | 21.19 | 20.27 |
| Marsico Focus Institutional | 10.97 | 20.01 | 26.26 | 9.89 | 18.36 | 19.9 |
| | | | | | | |
| Benchmark: Russell 1000 Growth Index | 14.63 | 21.00 | 25.32 | 10.96 | 19.50 | 18.96 |

123.    Once again, the chart above demonstrates that the T. Rowe Price Growth Stock Fund underperformed its Russell 1000 Growth Index benchmark on a 5-year average basis since before the start of the Class Period and continued to underperform throughout the Class Period. More specifically, T. Rowe Price Growth Stock Fund underperformed against the Russell 1000 Growth Index benchmark on a 5-year average basis in *every instance* in 2019, 2020, 2021, 2022, 2023 and 2024.

124.    Altogether, the charts above span from the first day of 2015 until the last day of 2024, demonstrating that the T. Rowe Price Growth Stock Fund underperformed in both good markets and bad markets.

125.    Looking at this data together, the T. Rowe Price Growth Stock Fund underperformed across several metrics for *years before* the Class Period, and for *years into* the

Class Period. This consistent underperformance data was publicly available to the Committee at the time of their decision-making, whether they reviewed the funds annually or quarterly (if at all). Prudent fiduciaries would have acknowledged that this pattern of underperformance did not bode well for the T. Rowe Price Growth Stock Fund's future performance and would have made a timely switch to any of the numerous safer, better managed, and ultimately more optimistic investment options.

126.    Given the long history of underperformance, it's inexplicable why the T. Rowe Price Growth Stock Fund would have been included as Plan investment options by the start of the Class Period and kept in place.

### D.    The Company Improperly Reduced its 401(a) Plan Contributions Through Forfeiture Accounts

127.    During the Class Period, Defendants breached their ERISA fiduciary duties by misusing the 401(a) Plan's assets for Defendants' own benefit and to the detriment of Plan participants.

128.    As alleged above, Defendants had a choice on how to utilize forfeited amounts. At the discretion of Defendants in their fiduciary capacity, forfeitures may be used to either pay the 401(a) Plan's expenses or reduce the Company's contributions to the 401(a) Plan.

129.    Using the forfeitures to reduce Company contributions is always in the best interest of Legacy because that option would decrease its own contribution costs.

130.    Absent any risk that Legacy would be unable to satisfy its contribution obligations, using forfeitures to pay 401(a) Plan expenses would be in the participants' best interest because that option would reduce or eliminate amounts otherwise charged to their accounts to cover such expenses.

131.    In deciding between using forfeitures to benefit the Company or using forfeitures to benefit the participants, Defendants are presented with a conflict of interest in administering the 401(a) Plan and managing and disposing of the 401(a) Plan assets.

132.    Despite the conflict of interest presented by this decision, Defendants failed to undertake any investigation into which option was in the best interest of the 401(a) Plan's participants and beneficiaries.

133.    Defendants did not, for example, investigate whether there was a risk that Legacy would be unable to satisfy its contribution obligations if forfeitures were used to pay 401(a) Plan expenses, or evaluate whether there were sufficient forfeitures to eliminate the 401(a) Plan's expenses charged to participants and still offset a portion of Legacy's own contribution obligations, as a prudent person would have done.

134.    Defendants also failed to consult with an independent, non-conflicted decisionmaker to advise them in deciding upon the best course of action for allocating the forfeitures in the 401(a) Plan, as a prudent person would have done.

135.    Although ERISA, and the Legacy Health Retirement Committee Charter, requires fiduciaries to manage the 401(a) Plan's assets solely in the interest of participants and although the 401(a) Plan grants Defendants discretion to use forfeitures to pay 401(a) Plan expenses, thereby reducing or eliminating the amounts charged to participant accounts to cover such expenses, Defendants have consistently declined to use the 401(a) Plan's assets for such purpose during the putative class period.

136.    Since at least the beginning of the Class Period, Defendants have improperly used forfeited non-vested Plan assets for the Company's own benefit to reduce future Company contributions instead of using the funds to benefit 401(a) Plan participants.

137.    According to information from the Plan's Form 5500, the following represents the balance in the 401(a) Plan's forfeiture accounts during the Class Period, the amount of the forfeiture improperly used to offset the Company's contributions to the 401(a) Plan, and the amounts used to pay for Plan administration costs:

| Plan Year | Forfeiture Amount | Offset Company Contributions | Offset 401(a) Plan Expenses |
|---|---|---|---|
| 2019 | $917,626 | $759,516 | $0 |
| 2020 | $908,257 | $828,507 | $0 |
| 2021 | $1,111,170 | $1,041,026 | $0 |
| 2022 | $1,139,228 | $1,111,170 | $0 |
| 2023 | $1,404,091 | $1,139,228 | $0 |
| TOTAL | $5,480,372 | $4,879,447 | $0 |

138.    Based on the above table, from the beginning of the Class Period through 2023, almost $5 million was improperly steered from paying 401(a) Plan administrative expenses and instead used to benefit the Company.

139.    For each year during the Class Period, Legacy had sufficient cash and equivalents on hand to satisfy its contribution obligations to the 401(a) Plan. Nevertheless, throughout the Class Period, Defendants consistently based the decision of how to allocate forfeitures solely on Legacy's own self-interests and failed to consider the interests of the 401(a) Plan and its participants.

140.    Defendants effectively placed their own interests above the interests of the 401(a) Plan and its participants and caused harm to the 401(a) Plan and its participants by reducing 401(a) Plan assets, not allocating forfeited funds to 401(a) Plan participants' accounts, and also caused 401(a) Plan participants to incur at least $4.8 million in expenses that could otherwise have been covered in whole or in part by forfeited funds.

**COUNT I**

## Breaches of Fiduciary Duty of Prudence
### (Against Committee Defendants)

141.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

142.    At all relevant times, the Committee and its members ("Prudence Defendants") were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority or control over the administration and/or management of the Plans or disposition of the Plans' assets.

143.    As fiduciaries of the Plans, the Prudence Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plans for the sole and exclusive benefit of Plans' participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

144.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Prudence Defendants did not make decisions regarding the Plans' investment lineup based solely on the merits of each investment and what was in the interest of Plans' participants. Instead, the Prudence Defendants selected and retained investment options in the Plans despite poor performance in relation to other comparable investments.

145.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Prudence Defendants complied with their fiduciary obligations, the Plans would not have suffered these losses, and Plans' participants would have had more money available to them for their retirement.

146.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

147.    The Prudence Defendants knowingly participated in each breach, knowing that such acts were a breach, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

## COUNT II
### Breach of Fiduciary Duty of Loyalty
### (Asserted against the Company, the Committee and Board Defendants)

148.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

149.    At all relevant times, the Company, the Committee Defendants, and the Board Defendants ("Loyalty Defendants") were fiduciaries of the 401(a) Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the 401(a) Plan or disposition of the 401(a) Plan's assets.

150.    As fiduciaries of the 401(a) Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).

151.    The Loyalty Defendants were required to discharge their duties to the 401(a) Plan "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plans." Committee Charter, at 3.

152.    The Loyalty Defendants failed to exercise their duty of loyalty to the 401(a) Plan and its participants by utilizing forfeited funds in the 401(a) Plan for the benefit of the Company instead of the sole interest of the 401(a) Plan participants and beneficiaries.

153.    The Loyalty Defendants used these 401(a) Plan assets for the purpose of reducing the Company's own contributions to the 401(a) Plan, thereby saving the Company millions of dollars each year at the expense of the 401(a) Plan which received decreased Company contributions, and its participants and beneficiaries were forced to incur avoidable expense deductions to their individual accounts.

154.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the 401(a) Plan suffered millions of dollars in losses.

155.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Loyalty Defendants are liable to restore to the 401(a) Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

156.    Each Loyalty Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT III
### Breach of ERISA's Anti-Inurement Provision
### (Asserted against the Company and the Board Defendants)

157.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

158.    Pursuant to 29 U.S.C. § 1103(c)(1), "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purpose of providing benefits to

participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."

159.    Because all forfeited 401(a) Plan participant funds are initially placed in the 401(a) Plan's trust, these forfeited funds are 401(a) Plan assets.

160.    The Company's use of the forfeited funds to defray its own contributions to the 401(a) Plan in order to save itself millions of dollars in funds that the Company would otherwise have to contribute to the 401(a) Plan, caused the assets of the 401(a) Plan to inure to the benefit of the Company in violation of 29 U.S.C. § 1103(c)(1).

161.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Loyalty Defendants are liable to restore to the 401(a) Plan all losses caused by their breaches of ERISA's anti-inurement provision, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

162.    Each Loyalty Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT IV
### Failure to Adequately Monitor Other Fiduciaries
### (Asserted against the Company and the Board)

163.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

164.    Allina and the Board, and its members (the "Monitoring Defendants"), had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plans.

165.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plans in the event that the Committee Defendants were not fulfilling those duties.

166.    The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; and reported regularly to the Monitoring Defendants.

167.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

      (a)    failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plans suffered significant losses as a result of the Committee Defendants' imprudent actions; and

      (b)    failing to remove Committee members whose performance were inadequate, all to the detriment of the Plans and Plans' participants' retirement savings.

168.    As a consequence of the foregoing breaches of the duty to monitor, the Plans suffered millions of dollars of losses. Had the Monitoring Defendants complied with their fiduciary obligations, the Plans would not have suffered these losses, and the Plans' participants would have had more money available to them for their retirement.

169.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plans all losses caused by their failure to adequately monitor the Committee

Defendants. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.      A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.      A Declaration that the Defendants have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits the Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Company to disgorge all profits received from, or in respect of, the Plans, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, as necessary to effectuate said relief, and to prevent the Defendants' unjust enrichment;

F.      Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Dated: June 17, 2025                    Respectfully submitted,

*/s/ Neil P. Halttunen*
Neil P. Halttunen, Esquire (OR 206806)
**JARVIS BRIDGE HALTTUNEN & WEYER LLC**
484 NE Bovard Avenue
Dallas, OR  97338
Email:  halt@jbhwlaw.com
Tel.: (503) 623-6676

Mark K. Gyandoh, Esquire
(*Pro Hac Vice* to be requested)
James A. Maro, Esquire
(*Pro Hac Vice* to be requested)
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
Email: markg@capozziadler.com
        jamesm@capozziadler.com
Tel.: (610) 890-0200
Fax: (717) 232-3080

*Counsel for Plaintiff and the Putative Class*