Thomas R. Johnson (OSB No. 010645)
Alexandra Choi Giza (OSB No. 214485)
STOEL RIVES LLP
760 SW Ninth Ave., Suite 3000
Portland, OR 97205
Tel: 503.224.3380
Fax: 503.220.2480
tom.johnson@stoel.com
alexandra.giza@stoel.com

Jeremy P. Blumenfeld (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
2222 Market Street
Philadelphia, PA 19103
Tel: 215.963.5000
Fax: 215.963.5001
jeremy.blumenfeld@morganlewis.com

Keri L. Engelman (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110
Tel: 617.341.7700
Fax: 617.341.7701
keri.engelman@morganlewis.com

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

JEFFERY FOLEY, et al.,

Plaintiffs,

v.

LEGACY HEALTH, et al.,

Defendants.

Case No. 3:25-cv-01041-AN

**DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS


Page

I. INTRODUCTION ... 1

II. PLAINTIFFS' FACTUAL ALLEGATIONS ... 4

A. The Plans' Stable Value Fund: the "Lincoln Stable Value Separate Account GIC." ... 5

1. Stable Value Funds. ... 5

2. The Lincoln Stable Value Separate Account GIC. ... 6

3. The Comparator Stable Value Funds. ... 7

B. The T. Rowe Price Growth Stock Fund. ... 8

C. The Plan's Use of Forfeitures. ... 8

III. LEGAL STANDARD ... 9

IV. ARGUMENT ... 13

A. Plaintiffs Fail to State a Claim for Breach of Fiduciary Duty Regarding the Lincoln Stable Value Separate Account GIC. ... 13

1. Plaintiffs' Challenge to the Lincoln Stable Value Separate Account GIC Fails as a Matter of Law Because Plaintiffs Do Not Allege Facts Sufficient to Establish That the Comparators Are a Meaningful Benchmark for the Lincoln Stable Value Separate Account GIC or Have the Same Risks, Strategy, and Holdings. ... 13

2. Plaintiffs' Challenge to the Lincoln Stable Value Separate Account GIC Fails as a Matter of Law Because Short-Term, Unsubstantial Performance Differences Are Not Enough to State a Plausible Imprudence Claim. ... 17

B. Plaintiffs Fail to State a Claim for Breach of Fiduciary Duty Regarding the T. Rowe Price Growth Stock Fund. ... 19

C. Plaintiffs Fail to State a Claim Regarding the DC Plan's Use of Forfeitures. ... 21

1. ERISA Does Not Require Increasing Plaintiffs' Benefits Under the DC Plan. ... 22

2. Plaintiffs' Breach of Fiduciary Duty Claims Are Foreclosed by Decades of Settled Law Permitting the Use of Forfeitures to Provide Benefits to Other Plan Participants ... 24

a. Congressional and Regulatory Background. ... 24

b. Plaintiffs' Theory of Liability Contradicts This Established Law. ... 28

c. Plaintiffs' Breach of Fiduciary Duty Claims Fail Under the Precedent and Regulatory Guidance Explained Above. ... 30

**TABLE OF CONTENTS**
(continued)

**Page**


D. Plaintiffs Fail to Plausibly Allege a Violation of ERISA's Anti-Inurement Clause .......... 33

E. Plaintiffs' Derivative Duty-to-Monitor Claim Also Fails. .......... 35

V. CONCLUSION .......... 35

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Albert v. Oshkosh Corp.*,
47 F.4th 570 (7th Cir. 2022) ....................10

*Anderson v. Intel Corp.*,
2021 WL 229235, at *4 (N.D. Cal. Jan. 21, 2021) ....................11

*Anderson v. Intel Corp. Investment Policy Committee*,
137 F.4th 1015 (9th Cir. 2025) .................... *passim*

*Armenta v. WillScot Mobile Mini Holdings Corp.*,
2025 WL 2645518 (D. Ariz. Sept. 15, 2025)....................22, 29

*Barchock v. CVS Health Corp.*,
886 F.3d 43 (1st Cir. 2018).................... *passim*

*Barragan v. Honeywell Int'l Inc.*,
2024 WL 5165330 (D.N.J. Dec. 19, 2024)....................21, 29, 32, 34

*Barragan v. Honeywell Int'l Inc.*,
2025 WL 2383652 (D.N.J. Aug. 18, 2025) ....................21, 24

*Beldock v. Microsoft Corp.*,
2023 WL 3058016 (W.D. Wash. Apr. 24, 2023)....................18, 20

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)....................9

*Bozzini v. Ferguson Enters. LLC*,
2024 WL 4008760 (N.D. Cal., Aug. 30, 2024) ....................20

*Bracalente v. Cisco Sys., Inc.*,
2023 WL 5184138 (N.D. Cal. Aug. 11, 2023) ....................19, 20, 35

*Cain v. Siemens Corp.*,
2025 WL 2172684 (D.N.J. July 31, 2025)....................21, 29

*Cano v. The Home Depot, Inc.*,
2025 WL 2589567, at *4-6 (N.D. Ga. Aug. 26, 2025) ....................22, 29, 32

*Christensen v. Harris Cnty.*,
529 U.S. 576 (2000)....................29

*Collins v. Pension & Ins. Comm. of S. Cal. Rock Prods.*,
144 F.3d 1279 (9th Cir. 1998) ....................34

*Commc'ns Workers of Am. v. Alcatel-Lucent USA, Inc.*,
2018 WL 4908281 (D.N.J. Oct. 10, 2018)....................34

*Commodity Futures Trading Comm'n v. Schor*,
478 U.S. 833 (1986)....................28

*Curtiss-Wright Corp. v. Schoonejongen*,
514 U.S. 73 (1995)....................22

*Davis v. Wash. Univ. in St. Louis*,
960 F.3d 478 (8th Cir. 2020) ....................20

*Dimou v. Thermo Fisher Sci. Inc.*,
2024 WL 4508450 (S.D. Cal. Sept. 19, 2024)....................21, 24, 34

*Dimou v. Thermo Fisher Sci. Inc.*,
2025 WL 2611240 (S.D. Cal. Sept. 9, 2025)....................21

*Douglas v. Xerox Bus. Servs., LLC*,
875 F.3d 884 (9th Cir. 2017) ....................28

*EEOC v. Abercrombie & Fitch Stores, Inc.*,
575 U.S. 768 (2015)....................28

*Ellis v. Fidelity Mgmt. Tr. Co.*,
883 F.3d 1 (1st Cir. 2018)....................16

*Enstrom v. SAS Inst.*,
2025 WL 685219 (E.D.N.C. Mar. 3, 2025) ....................18

*Estay v. Ochsner Clinic Found.*,
2025 WL 2644782 (E.D. La Sept. 15, 2025) ....................22, 24

*Fifth Third Bancorp v. Dudenhoeffer*,
573 U.S. 409 (2014)....................4, 23

*First Nat'l Bank of Chi. v. Comptroller of Currency of U.S.*,
956 F.2d 1360 (7th Cir. 1992) ....................2, 31

*Fumich v. Novo Nordisk Inc.*,
2025 WL 2399134 (D.N.J. Aug. 19, 2025) ....................21, 29, 32

*Hall v. Cap. One Fin. Corp.*,
2023 WL 2333304 (E.D. Va. Mar. 1, 2023)....................18

*Harvey v. Bed Bath & Beyond, Inc. 401(K) Savings Plan Comm.*,
No. 2:23-cv-20376 (D.N.J. Sept. 14, 2023) ..........16

*Hlinka v. Bethlehem Steel Corp.*,
863 F.2d 279 (3d Cir. 1988) ..........22

*Holliday v. Xerox Corp.*,
732 F.2d 548 (6th Cir. 1984) ..........34

*Hughes Aircraft Co. v. Jacobson*,
525 U.S. 432 (1999) ..........22, 33, 34

*Hughes v. Nw. Univ.*,
595 U.S. 170 (2022) ..........4

*Hutchins v. HP Inc.*,
737 F. Supp. 3d 851 (N.D. Cal. 2024) ..........23, 24, 34

*Hutchins v. HP Inc.*,
767 F. Supp. 3d 912 (N.D. Cal. 2025) .......... *passim*

*Hutchins v. HP Inc.*,
No. 25-826 (9th Cir. July 9, 2025) ..........23, 29

*In re Unisys Savings Plan Litigation*,
74 F.3d 420 (3d Cir. 1996) ..........16

*Krohnengold v. N.Y. Life Ins. Co.*,
2022 WL 3227812 (S.D.N.Y. Aug. 10, 2022) ..........34

*Lalonde v. Mass Mut. Ins. Co.*,
728 F. Supp. 3d 141 (D. Mass. 2024) ..........18

*Lockheed Corp. v. Spink*,
517 U.S. 882 (1996) ..........34

*Loomis v. Exelon Corp.*,
658 F.3d 667 (7th Cir. 2011) ..........23

*Madrigal v. Kaiser Found. Health Plan, Inc.*,
2025 WL 1299002 (C.D. Cal. May 2, 2025) .......... *passim*

*Matney v. Barrick Gold of N. Am.*,
80 F.4th 1136 (10th Cir. 2023) ..........10

*Matousek v. MidAmerican Energy Co.*,
51 F.4th 274 (8th Cir. 2022) ..........10

*McWashington v. Nordstrom, Inc.*,
2025 WL 1736765 (W.D. Wash. June 23, 2025)........................................................... *passim*

*Mertens v. Hewitt Assocs.*,
508 U.S. 248 (1993)..................................................................................................28

*Middleton v. Amentum Parent Holdings, LLC*,
2025 WL 2229959 (D. Kan. Aug. 5, 2025) ........................................................21, 24, 29, 32

*Naylor v. BAE Sys., Inc.*,
2024 WL 4112322 (E.D. Va. Sept. 5, 2024)...........................................................21, 32, 34

*Partida v. Schenker Inc.*,
2024 WL 1354432 (N.D. Cal. Mar. 29, 2024)...............................................................20

*Patterson v. Cap. Grp. Cos.*,
2018 WL 748104 (C.D. Cal. Jan. 23, 2018) .................................................................35

*Phillips v. Cobham Advanced Elec. Sols., Inc.*,
2024 WL 3228097 (N.D. Cal. June 28, 2024) ...........................................................5, 19, 20

*Plancarte Sauceda v. Garland*,
23 F.4th 824 (9th Cir. 2022) ........................................................................................28

*Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*,
541 U.S. 1 (2004).........................................................................................................33

*Renfro v. Unisys Corp.*,
671 F.3d 314 (3d Cir. 2011)....................................................................................10, 16

*Sievert v. Knight-Swift Transp. Holdings, Inc.*,
780 F. Supp. 3d 870 (D. Ariz. 2025) ..................................................................... passim

*Singh v. Deloitte LLP*,
123 F.4th 88 (2d Cir. 2024) .........................................................................................10

*Smith v. CommonSpirit Health*,
2021 WL 4097052 (E.D. Ky. Sept. 8, 2021) ..................................................................20

*Smith v. CommonSpirit Health*,
37 F.4th 1160 (6th Cir. 2022) ..................................................................................10, 17

*Steen v. Sonoco Prods. Co.*,
2025 WL 2420725 (D.S.C. June 4, 2025).................................................................21, 29, 34

*Twombly v. Bell Atl. Corp.*,
313 F. Supp. 2d 174 (S.D.N.Y. 2003).............................................................................9

*US Airways, Inc. v. McCutchen*,
569 U.S. 88 (2013) ....................22

*Wehner v. Genentech, Inc*.,
2021 WL 507599 (N.D. Cal. Feb. 9, 2021) ....................20

*White v. Chevron Corp.*,
2017 WL 2352137 (N.D. Cal. May 31, 2017) ....................2, 4, 5

*Wright v. JPMorgan Chase & Co.*,
2025 WL 1683642 (C.D. Cal. June 13, 2025) .................... *passim*

*Wright v. Oregon Metallurgical Corp.*,
360 F.3d 1090 (9th Cir. 2004) ....................24, 31

**MOTION**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants Legacy Health, the Board of Directors of Legacy Health, and the Legacy Health Retirement Committee (collectively "Legacy Health"), move to dismiss the Amended Complaint (Dkt. No. 18) (hereinafter, the "Complaint" or "Compl.") filed by Plaintiffs Jeffery Foley, Julianne Griffin, Randy Reyes, and Shlonda White, for failure to state a claim upon which relief can be granted. This Motion is supported by the following memorandum and accompanying exhibits.

**LOCAL RULE 7.1 CERTIFICATION**

Counsel for Legacy Health has conferred with counsel for Plaintiffs in a good faith effort to resolve their dispute regarding this Motion. The parties have been unable to resolve their dispute.

**MEMORANDUM IN SUPPORT**

## I. INTRODUCTION

Plaintiffs are former employees of Legacy Health. In this lawsuit, Plaintiffs allege that Legacy Health breached its fiduciary duties and violated the Employee Retirement Income Security Act ("ERISA") with respect to the Legacy Health 403(b) Plan (the "403(b) Plan") and the Legacy Health Defined Contribution Retirement Plan (the "DC Plan") (collectively "the Plans") in three ways:

(1) offering the "Lincoln Stable Value Separate Account GIC"—which the Complaint describes as a "separate account" fund—as a stable value fund investment option when certain other stable value funds allegedly performed better (Compl. ¶ 15);

(2) offering the T. Rowe Price Growth Stock fund as an investment option when other funds available in the market allegedly performed better (*id.* ¶ 18); and

(3) using "forfeitures" to offset employer contributions in the DC Plan (*id.* ¶ 19).

These sorts of investment-related allegations have become ubiquitous in recent years, and courts—including the Ninth Circuit—have overwhelmingly rejected them. In *Anderson v. Intel Corp. Investment Policy Committee*, the Ninth Circuit squarely held: "it is not enough for a plaintiff simply to allege that the fiduciaries could have obtained better results—whether higher returns, lower risks, or reduced costs—by choosing different investments." 137 F.4th 1015, 1021-22 (9th Cir. 2025), (affirming dismissal of breach of fiduciary claims challenging plan investment options), *petition for cert. filed*, No. 25-498 (U.S. Oct. 22, 2025); *see also, e.g.*, *White v. Chevron Corp.*, 2017 WL 2352137, at *20 (N.D. Cal. May 31, 2017) ("[P]oor performance, standing alone, is not sufficient to create a reasonable inference that plan fiduciaries failed to conduct an adequate investigation."), *aff'd*, 752 F. App'x 453 (9th Cir. 2018); *Barchock v. CVS Health Corp.*, 886 F.3d 43 (1st Cir. 2018) (affirming dismissal of stable value claim).

Similarly, courts in the Ninth Circuit have consistently rejected forfeiture claims virtually identical to those that Plaintiffs assert here. *See, e.g.*, *Wright v. JPMorgan Chase & Co.*, 2025 WL 1683642, at *3-4 (C.D. Cal. June 13, 2025) (dismissing forfeiture claims), *appeal docketed*, No. 25-4235 (9th Cir. July 9, 2025); *Hutchins v. HP Inc.*, 767 F. Supp. 3d 912 (N.D. Cal. 2025) ("*Hutchins II*") (same), *appeal docketed*, No. 25-826 (9th Cir. Feb. 7, 2025); *Madrigal v. Kaiser Found. Health Plan, Inc.*, 2025 WL 1299002 (C.D. Cal. May 2, 2025) (same); *Sievert v. Knight-Swift Transp. Holdings, Inc.*, 780 F. Supp. 3d 870 (D. Ariz. 2025) (same); *McWashington v. Nordstrom, Inc.*, 2025 WL 1736765 (W.D. Wash. June 23, 2025) (same), *appeal docketed*, No. 25-4613 (9th Cir. July 24, 2025).

This Court should dismiss each of those claims too.

*First*, Plaintiffs' allegations challenging the Lincoln Stable Value Separate Account GIC fail to state a claim. Plaintiffs admit that they have no knowledge about Legacy Health's fiduciary

process, and cannot allege any criticisms of the actual process. (Compl. ¶ 91.) Moreover, the Complaint does not allege any facts about the risks, holdings, strategy, or substantive contract terms of the Lincoln Stable Value Separate Account GIC or any of the alleged comparator stable value funds mentioned in the Complaint. In other words, Plaintiffs do not allege facts suggesting that the other stable value funds they point to are a "meaningful benchmark" for the Lincoln Stable Value Separate Account GIC. As the Ninth Circuit recently held in *Anderson*, that is fatal to Plaintiffs' claims and subjects them to Rule 12(b)(6) dismissal. 137 F.4th at 1022. And while the premise of Plaintiffs' allegations is that every single fund with "stable value" in the name is effectively the same, the Ninth Circuit also rejected that precise argument in *Anderson*. *Id.* at 1023 ("[S]imply labeling funds as 'comparable' or 'a peer' is insufficient to establish that those funds are meaningful benchmarks." (citations omitted)). Even setting those pleading failures aside, Plaintiffs' allegations of short-term, unsubstantial performance differences among stable value funds during cherry-picked time periods cannot state a viable claim for relief. *See* *Barchock*, 886 F.3d at 49-50 (affirming Rule 12 dismissal of stable value fund challenge despite allegations that other stable value funds performed better: "conservativism in the management of a stable value fund—when consistent with the fund's objectives disclosed to the plan participants—is no vice").

Second, Plaintiffs' challenge to the T. Rowe Price Growth Stock fund fails for the same reasons. Although Plaintiffs allege that a handful of other funds performed better, the Complaint does not allege that those funds have the same holdings, risks, asset allocations, investment strategies, or objectives as the T. Rowe Price Growth Stock fund. Indeed, the Complaint does not allege *any* facts about either the T. Rowe Price Growth Stock fund or any of its comparators. *Anderson* requires more.

Lastly, Plaintiffs' forfeiture claims likewise fail to state a claim. "Forfeitures" are just employer contributions to employees that terminated employment before vesting, but they are still employer contributions. For that reason, and as numerous courts have recently held, plans can use forfeitures precisely the way the DC Plan did here. *E.g.*, *Wright*, 2025 WL 1683642, at *3 ("[T]he law allows Defendants to use forfeited funds to reduce employer contributions; indeed, any theory to the contrary would mark a significant departure from decades of well-settled precedent."); *Hutchins II*, 767 F. Supp. 3d at 922 ("[T]he Court agrees that Plaintiff's theory seems to ignore decades of settled law" (quotations omitted)). Moreover, Plaintiffs *do not allege* that they received less contributed to their own Plan accounts than called for under the terms of the DC Plan and *do not allege* that the DC Plan terms prohibit using forfeitures to offset contributions. Under these circumstances, courts have overwhelmingly rejected the legal theories advanced in the Complaint.

The Supreme Court has emphasized that, even at the pleading stage, district courts "must give due regard to the range of reasonable judgments a fiduciary may make." *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022). And Rule 12(b)(6) remains an "important mechanism" for "weeding out meritless" claims against ERISA plan fiduciaries. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). For each of these reasons, and those set forth below, Plaintiffs' Complaint should be dismissed in its entirety.

## II. PLAINTIFFS' FACTUAL ALLEGATIONS[1]

As a benefit to its workforce, Legacy Health offers its employees the opportunity to participate in the Plans, both of which are defined contribution retirement plans.

---

[1] In addition to Plaintiffs' allegations and any documents subject to judicial notice, the Court may consider at the motion-to-dismiss stage documents that are "referenced extensively" in Plaintiffs' Complaint and documents that "form the basis" of Plaintiffs' claims. *White*, 2017 WL 2352137, at *5 (citing *Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007); *No. 84 Emp.-Teamster Jt. Couns. Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 925 n.2 (9th Cir. 2003)). Accordingly, the Court may properly consider the copies of the Plans' Annual Reports/Forms 5500 submitted

Plaintiffs allege they participated in the Plans during their employment. (Compl. ¶¶ 26-29.) Both the DC Plan and the 403(b) Plan offer roughly thirty investment options in which participants can choose to invest. (Ex. A (DC Plan 2023 Annual Report/Form 5500) at 39; Ex. B (403(b) Plan 2023 Annual Report/Form 5500) at 44.) Among the Plans' investment options are the Lincoln Stable Value Separate Account GIC and the T. Rowe Price Growth Stock fund that Plaintiffs challenge in the Complaint. (Compl. ¶¶ 15, 18.)

### A. The Plans' Stable Value Fund: the "Lincoln Stable Value Separate Account GIC."

#### 1. Stable Value Funds.

Before addressing the specific stable value fund Plaintiffs challenge, some background on stable value funds based on the allegations in the Complaint may be helpful.

A stable value fund is an investment that is "intended to provide participants with an option that protects their assets and is shielded from risks of loss." (Compl. ¶ 97.) All stable value funds have investment contracts associated with them. (*Id.* ¶¶ 97-98.) Stable value funds are sometimes referred to as "Guaranteed Investment Contracts" or "GICs." (*Id.* ¶ 97.) As the Complaint acknowledges, there are different types of stable value funds: "general account," "separate account," and "synthetic" funds. (*Id.* ¶¶ 99-101.)

General account funds are "the *riskiest type* of stable value fund because they are more vulnerable to single entity credit risk." (*Id.* ¶ 101 (emphasis added).) The assets are "held unrestricted in the general account of the insurance carrier." (*Id.*) As a result, they are "more

---

herewith, which are referenced extensively in Plaintiffs' Complaint and which—as publicly available documents filed with a government agency—are otherwise subject to judicial notice. (Compl. ¶¶ 10-11, 13, 34, 47, 60-61, 63, 65-66, 104, 146.) *See* *White*, 2017 WL 2352137, at *5 (considering Forms 5500 while ruling on motion to dismiss); *see also, e.g.*, *Phillips v. Cobham Advanced Elec. Sols., Inc.*, 2024 WL 3228097, at *5 (N.D. Cal. June 28, 2024) (same).

vulnerable to single entity credit risk and are riskier than separate account GICs." (*Id.*) "Consequently, general account GICs offer the highest rates." (*Id.*) As the Complaint explains further:

> Because the funds are kept in unrestricted accounts, they are generally subject to claims and liabilities asserted against the insurer. Such funds are subject to single entity credit risk, meaning the insurer is the sole entity responsible for paying such funds. If the insurer fails to pay funds, no other entity will satisfy the loan.

(*Id.* ¶ 102.)

By contrast, in a separate account fund, "the insurer's payment obligations are putatively backed by a separate account, which is less susceptible to claims and liabilities against the insurer." (*Id.* ¶ 100.) As discussed further below, the Lincoln Stable Value Separate Account GIC that Plaintiffs challenge is a "separate account" fund. (*Id.* ¶¶ 15, 59.)

A synthetic fund is "the least risky" type of stable value fund, in part because "the fund owns the assets of the underlying funds" that make up the investment vehicle. (*Id.* ¶ 99.)

### 2. The Lincoln Stable Value Separate Account GIC.

The Plans offer the Lincoln Stable Value Separate Account GIC—which the Complaint short-hands as the "LSA GIC"—as an investment option in the Plans. This is a "*separate account GIC* with Lincoln National Life Insurance Company." (*Id.* ¶ 15 (emphasis added); *see also id.* ¶ 59 (same).) According to the Complaint, "LSA GIC" stands for "Lincoln Separate Account Guaranteed Investment Contract." (*Id.* (emphasis added).) The Complaint also cites and quotes the Plans' 2023 Annual Reports/Forms 5500, which make clear that "The Plan invests in a fully benefit-responsive guaranteed investment contract (FBRIC) with Lincoln National Life Insurance Company (Lincoln). Lincoln maintains the contributions *in a separate account*." (Compl. ¶ 104; Ex. A at 35 (emphasis added); Ex. B at 39 (emphasis added).)

The Complaint does not allege *any* facts about the underlying holdings or investment strategy of the Lincoln Stable Value Separate Account GIC. In other words, the Complaint does not allege any facts about the strategy, credit risk, or interest rate risk of the Lincoln Separate Account Guaranteed Investment Contract. Nor does it allege *any* facts about the actual substantive terms of the "contract" that are reflected in the "guaranteed investment contract," including the liquidity, withdrawal or termination provisions, or investment guidelines or restrictions.

**3. The Comparator Stable Value Funds.**

The Complaint identifies a few other plans with stable value funds that allegedly had higher crediting rates than the Lincoln Stable Value Separate Account GIC in specific years between 2019-2023. (Compl. ¶¶ 108-09.) For each of the proposed comparator funds, Plaintiffs reference general information that is presented in the publicly available IRS Forms 5500 filed by the sponsors of the retirement plans that offered those funds. (Compl. ¶ 108.) The Complaint does not allege *any* facts about the underlying holdings, credit risk, or interest rate risks of the comparator funds.[2] And although the Complaint alleges that each of the comparators has a "Guaranteed

[2] For most of the comparators, the Complaint does not even identify the type of stable value fund at issue. For two comparators—Gemba Group Annuity Plan and Pomona Valley Hospital Medical Center Retirement Savings Plan—the Complaint cites their respective Forms 5500 as saying that those plans invested in "synthetic" stable value funds. (Compl. ¶ 108 (citing and quoting the plans' Forms 5500 for 2023).) The Forms 5500 do not say that. (Ex. C, Gemba Group Annuity Plan 2023 Annual Report/Form 5500; Ex. D, Pomona Valley Hospital Medical Center Retirement Savings Plan 2023 Annual Report/Form 5500.) Neither Form 5500 represents that those plans invested in "synthetic" stable value funds. To the contrary, both Forms 5500 state that the funds in question are "general account" stable value funds. (Ex. C at page 50, line 14; Ex. D at page 18, line 14; *see also* Ex. D at page 42); *see also* https://www.stablevalue.org/general-account-gic/ (last visited Oct. 31, 2025) (noting that a "traditional" stable value fund is the same as a "general account" stable value fund).

Investment Contract," it does not allege the *terms* of any of these contracts, including the liquidity, withdrawal or termination provisions, or investment guidelines or restrictions.[3]

The few facts that the Complaint asserts regarding Plaintiffs' purported comparator funds only illustrate the ways in which those funds are *different* from the Lincoln Stable Value Separate Account GIC. Most notably, the Complaint does not allege that any of the comparator funds is a separate account fund like the Lincoln Stable Value Separate Account GIC. (*See id.* ¶ 108.)

**B. The T. Rowe Price Growth Stock Fund.**

The Complaint also identifies five other funds available in the market that purportedly performed better than the T. Rowe Price Growth Stock fund over three-year and five-year periods. (Compl. ¶ 128.) Plaintiffs state that the T. Rowe Price Growth Stock fund underperformed its benchmark, the Russell 1000 Growth Index. (*Id.*) The Complaint, however, once again does not allege the strategy, objectives, asset allocations, underlying holdings, or risks of either the T. Rowe Price Growth Stock fund or of any of its alleged "comparator" funds. (*See id.*) At most, the Complaint includes three (of five) "comparators" with "Growth" in their name, but nothing more.

**C. The Plan's Use of Forfeitures.**

As an additional benefit to its workforce, Legacy Health provides participants with employer contributions in the DC Plan. (Compl. ¶ 68.) Participants "vest" in the employer contributions over time. (*Id.* ¶¶ 72-73.) Those who leave before vesting "forfeit" any unvested amounts. (*Id.* ¶ 74.) These unvested amounts are referred to as "forfeitures." The terms of the DC

---

[3] The Complaint also alleges that the 403(b) Plan offers the "Lincoln Fixed Account GIC," which is a "traditional annuity contract," as a separate investment option. (Compl. ¶ 15.) The Complaint does not allege any facts about the terms of the annuity contract, liquidity, withdrawal or termination provisions, investment guidelines or restrictions, or risks of that annuity contract.

Plan allow forfeitures to be "applied to reduce future contributions or pay plan expenses." (*Id.* ¶ 76 (quoting DC Plan at 24).)[4]

Plaintiffs allege that forfeitures were applied to reduce future contributions. (*Id.* ¶ 146.) Plaintiffs do not allege that any provision of the DC Plan prohibits the use of forfeitures to reduce employer contributions. Plaintiffs do not allege that they did not receive all the employer contributions they were entitled to receive under the DC Plan.[5]

## III. **LEGAL STANDARD**

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible." *Anderson*, 137 F.4th at 1020 (citations and quotation marks omitted). Critically, merely including charts and graphs in a complaint does not mean that a complaint contains sufficient facts to avoid dismissal. After all, the complaint at issue in the Supreme Court's seminal decision on the Rule 12(b)(6) standard—*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)—included color-coded maps of various territories that allegedly "evidence[d] the degree to which the defendants operate in separate markets." *Twombly v. Bell Atl. Corp.*, 313 F. Supp. 2d 174, 182 (S.D.N.Y. 2003). But the Supreme Court held that such allegations did not state a claim for relief because the facts reflected on the maps, along with the rest of the complaint, did not make their claims plausible.

In *Anderson*, the Ninth Circuit applied that same principle when evaluating breach of fiduciary duty claims under ERISA. The court first explained that a plaintiff could allege a breach

---

[4] The DC Plan provides that forfeitures shall "first" be applied to restore prior forfeitures for employees who terminated employment before vesting and then timely returned to covered employment. (Compl. ¶ 75.) The Complaint does not allege that Legacy Health breached this provision or that forfeitures were not properly restored when necessary and appropriate to do so before being used for any other purposes.

[5] The Complaint does not allege that the 403(b) Plan had any employer contributions or forfeitures.

of fiduciary duty claim by directly alleging facts "that the fiduciaries employed unsound methods in making their investment decisions." *Anderson*, 137 F.4th at 1021. Plaintiffs here, however, admit that they have no knowledge about Legacy Health's "decision-making process with respect to the Plan, including [the] processes (and execution of such) for selecting, monitoring, and removing the Plan's investments." (Compl. ¶ 91.) Thus, like the plaintiffs in *Anderson*, Plaintiffs do not actually allege facts criticizing the fiduciary process. Instead, Plaintiffs seek to show a breach of fiduciary duty "through the circumstantial route." 137 F.4th at 1022. The Ninth Circuit in *Anderson* explained:

> When an ERISA plaintiff attempts to do so by relying on a theory that a prudent fiduciary in like circumstances would have selected a different fund based on the cost or performance of the selected fund, that plaintiff must provide a sound basis for comparison . . . . In other words, when a plaintiff alleges imprudence based on a fiduciary's decision to make one investment rather than an alternative, *the key to nudging an inference of imprudence from possible to plausible is providing a sound basis for comparison—a meaningful benchmark—not just alleging that costs are too high, or returns are too low.*
>
> *The need for a relevant comparator with similar objectives—not just a better-performing plan or investment—is implicit in ERISA's text*. By making the standard of care that of a hypothetical prudent person "acting *in a like capacity* ... in the conduct of an enterprise of a *like character* and with *like aims*," the statute makes clear that the goals of the plan matter. The Department of Labor regulations implementing ERISA do the same. Those regulations provide that the duty of prudence is satisfied if the fiduciary has made a determination that a chosen investment "is reasonably designed, as part of the portfolio . . ., to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain . . . *compared to* the opportunity for gain . . . associated with *reasonably available alternatives with similar risks*."

*Id.* (first and second emphases added, citations and quotations omitted).[6]

[6] Other Courts of Appeals agree. *See, e.g.*, *Barchock*, 886 F.3d at 49-53; *Singh v. Deloitte LLP*, 123 F.4th 88, 92, 94 (2d Cir. 2024); *Renfro v. Unisys Corp.*, 671 F.3d 314, 327-28 (3d Cir. 2011); *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1164-66 (6th Cir. 2022); *Albert v. Oshkosh Corp.*, 47 F.4th 570, 579-80 (7th Cir. 2022); *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 281 (8th Cir. 2022); *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1150 (10th Cir. 2023).

To understand application of these principles, it is useful to consider the facts alleged in the *Anderson* complaint, a copy of which is attached as Exhibit E.[7]

The plaintiffs there alleged breach of fiduciary duty claims under ERISA challenging investment options—specifically target date funds ("TDFs") and a Global Diversified Fund ("GDF")—in the Intel 401(k) plan. With respect to the TDFs, the plaintiffs alleged that the TDFs in the Intel plan performed substantially worse and were substantially more expensive than numerous other TDFs in the marketplace, and the complaint included charts showing the performance differences against "specific competing TDFs and to larger peer groups." (Ex. E ¶ 141.) Like the Complaint here, the complaint also included several tables showing the fee and performance differences. (*Id.* ¶¶ 151-77 and Tables 2-12.) The complaint also identified other plans with TDFs that were allegedly cheaper and performed better than TDFs in the Intel plan. (*Id.* ¶ 161 and Table 5.)

The complaint alleged that "comparing a given target date fund to peer TDFs of the same vintage is standard and reasonable practice for several reasons related to their common goals and features." (*Id.* ¶ 141.) The plaintiffs also alleged that all TDFs "generally share the following goals and features: (1) long-term investment vehicle designed for employee-participants who do not want themselves to actively manage their retirement savings; (2) a combination of asset classes, including at least publicly traded equity, fixed income securities and cash; (3) a 'glidepath' that specifies a defined, automatic decline in equity exposure over time, as the targeted retirement date approaches; and (4) moderate risk so the vehicle typically meets the definition of Qualified Default

[7] The Court can properly consider the Amended Complaint filed in *Anderson*. *See Anderson v. Intel Corp.*, 2021 WL 229235, at *4 (N.D. Cal. Jan. 21, 2021) (stating that courts may take judicial notice of matters that are either "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." (citing Fed. R. Evid. 201(b))), *aff'd*, 137 F.4th 1015 (9th Cir. 2025).

Investment Alternative ('QDIA') under Labor Department regulations." (*Id.*) The *Anderson* plaintiffs' allegations regarding the GDF were similar, with the same sorts of charts, allegations about appropriate comparators, and allegations showing underperformance over five- and ten-year time horizons. (*Id.* ¶¶ 190-92.)

Despite all the factual allegations about allegedly excessive fees and underperformance against other TDFs and other global balanced funds, the Ninth Circuit affirmed the Rule 12 dismissal of the complaint. The Ninth Circuit explained that "to the extent a plaintiff asks a court to infer that a fiduciary used improper methods based on the performance of the investments, as Anderson in part does here, *he must compare that performance to funds or investments that are meaningfully similar*." *Anderson*, 137 F.4th at 1023 (emphasis added) (citation omitted). *And the complaint failed this test because it did not allege facts demonstrating that the comparator funds had the same holdings, risks, or investment strategy as the challenged TDFs or GDF*. *Id.* Further, critically, the Ninth Circuit explained, "simply labeling funds as comparable or a peer is insufficient to establish that those funds are meaningful benchmarks against which to compare the performance of the Intel funds." *Id.* (quotations and citation omitted).

Moreover, the Ninth Circuit explained that "ERISA fiduciaries are not required to adopt a riskier strategy simply because that strategy may increase returns." *Id.* at 1024. And the complaint did not allege facts that the comparators sought to "mitigate risk to the same degree as Intel's funds," so they were not meaningful benchmarks for those funds. *Id.* at 1023.

Plaintiffs' allegations here suffer from the same flaws as the complaint in *Anderson*. The Complaint fails to state a claim and should be dismissed.

## IV. ARGUMENT

### A. Plaintiffs Fail to State a Claim for Breach of Fiduciary Duty Regarding the Lincoln Stable Value Separate Account GIC.

Against the legal framework established by the Ninth Circuit in *Anderson*, Plaintiffs' allegations regarding the Lincoln Stable Value Separate Account GIC fail to state a plausible claim because the Complaint does not allege: (1) any facts establishing that the purported comparator funds are a meaningful benchmark for the Lincoln Stable Value Separate Account GIC, or (2) performance differences that were sustained or substantial enough to allow any inference of imprudence. Each of these is independently fatal to Plaintiffs' claims.

#### 1. Plaintiffs' Challenge to the Lincoln Stable Value Separate Account GIC Fails as a Matter of Law Because Plaintiffs Do Not Allege Facts Sufficient to Establish That the Comparators Are a Meaningful Benchmark for the Lincoln Stable Value Separate Account GIC or Have the Same Risks, Strategy, and Holdings.

Under *Anderson*, Plaintiffs' challenge to the Lincoln Stable Value Separate Account GIC fails as a matter of law because the Complaint does not allege facts that, even taken as true, would be sufficient to establish that the proposed comparator stable value funds are a meaningful benchmark for the Lincoln Stable Value Separate Account GIC. *See Anderson*, *supra*. Specifically, Plaintiffs have not alleged *any* facts about the risks, holdings, investment strategies, or other "investment contract" terms of the Lincoln Stable Value Separate Account GIC or the comparator funds.

Plaintiffs admit that the Lincoln Stable Value Separate Account GIC is—as its name implies—a "separate account" fund. (Compl. ¶ 15.) As Plaintiffs put it, "Defendants allowed substantial assets in the Plans to be invested in *a separate account GIC* with Lincoln National Life Insurance Company (the Lincoln Stable Value Separate Account GIC (the "LSA GIC"))." (*Id.* (emphasis added)); *see also supra* at 6-7. They also admit that separate account funds are *less risky*

than general account stable value funds, and that general account funds are "the riskiest type of stable value funds." (Compl. ¶ 101.) In fact, general account funds are "subject to single entity credit risk, meaning the insurer is the sole entity responsible for paying such funds. If the insurer fails to pay, no other entity will satisfy the loan." (Compl. ¶ 102.)

Remarkably, the Complaint does not even allege that any of Plaintiffs' proffered comparator funds are separate account funds. (*See id.* ¶ 108.) In other words, despite alleging that there are "several different types of stable value investments in the retirement plan marketplace" and recognizing the fundamental differences between those types of funds (*id.* ¶¶ 99-102), the Complaint fails to identify a single other "separate account" fund with which to compare the Lincoln Stable Value Separate Account GIC. That failure alone renders Plaintiffs' comparators inapt.

Instead of alleging relevant facts regarding the Lincoln Stable Value Separate Account GIC and any of their purported comparators, Plaintiffs assert in conclusory fashion that all stable value funds are comparable as long as they (1) are "fully benefit-responsive," (2) "do not permit the insurance companies to terminate the agreements before the end of the contract," (3) have rates that are "reviewed regularly," and (4) "whose contracts are with creditworthy insurance carriers." (Compl. ¶ 105.) But that says nothing of the actual investment terms or risks of the different funds. Plaintiffs' assertions are akin to arguing that it is appropriate to compare the prices of a used Honda Civic and a new Chevrolet Suburban because both have four wheels and an engine. Or like saying that all mutual funds are the same because they are all registered with the SEC, provide prospectuses and annual reports to investors, and allow investors to benefit from gains on any underlying securities held by the fund. Of course, that was not sufficient in *Anderson* and is not sufficient here either.

Plaintiffs' failure to allege facts sufficient to establish that their proposed comparators are a meaningful benchmark for the Lincoln Stable Value Separate Account GIC warrants dismissal of their claims. Nevertheless, Plaintiffs will argue all stable value funds are sufficiently similar to each other such that any stable value fund can be compared to any other stable value fund. That argument does not hold water for multiple reasons.

First, the Ninth Circuit in *Anderson* rejected the same argument with respect to the funds in that case, despite the plaintiffs' allegations that all such funds had the same "goals and features" and were appropriate benchmarks for one another. *See supra* at 2-3, 9-12.

Second, the Complaint here admits—as it must—that all stable value funds are *not* the same. According to the Complaint, different types of stable value funds have *different* risks and different types of protections, and some are "the riskiest." (Compl. ¶¶ 99-102.) And the risks depend on, among other things, the type of stable value fund and the specific insurer responsible for "satisfy[ing] the loan." (*Id.*) The Ninth Circuit rejected the argument that funds with different risks could be compared, even on a risk-adjusted basis. *Anderson*, 137 F.4th at 1025 ("Nor does Anderson's 'risk-adjusted' analysis suffice. He alleges that the Intel funds had a greater 'risk per unit of return' than did other target-date funds. But an ERISA plaintiff cannot make incomparable funds comparable simply by using a ratio. The 'risk-adjusted' analysis does not allege that any funds with comparable risk profiles and greater returns actually existed.").

Third, and relatedly, Plaintiffs admit that "stable value investments are intended to provide participants with an option that protects their assets and is shielded from risks of loss." (Compl. ¶ 97.) Thus, the goal of a stable value fund is *not* to maximize investment returns, but to protect

assets and shield them from risk of loss.[8] Plaintiffs do not allege that the Lincoln Stable Value Separate Account GIC failed to meet those goals. And the Ninth Circuit in *Anderson* explained that "ERISA fiduciaries are not required to adopt a riskier strategy simply because that strategy may increase returns." 137 F.4th at 1024. Indeed, for that reason, the First Circuit in *Barchock* affirmed dismissal of a breach of fiduciary duty claim challenging a stable value fund because "conservativism in the management of a stable value fund—when consistent with the fund's objectives disclosed to the plan participants—is no vice." 886 F.3d at 49-50; *see also* *Ellis v. Fidelity Mgmt. Tr. Co.*, 883 F.3d 1, 10 (1st Cir. 2018) (rejecting breach of fiduciary duty claim regarding stable value fund where "the [challenged stable value fund's] returns exceeded those of money market funds throughout the class period" and "plaintiffs make no argument that offering [even] more conservative investments (such as money market funds) would constitute an ERISA violation").

Fourth, while all stable value funds may have investment contracts associated with them as Plaintiffs admit (Compl. ¶ 97), that does not mean that the contract *terms* are the same, or even remotely similar. The Complaint alleges no facts, for example, about the risks, investment

[8] In fact, the Third Circuit case Plaintiffs cite in their Complaint (¶ 88)—*In re Unisys Savings Plan Litigation*, 74 F.3d 420 (3d Cir. 1996) ("*Unisys*")—shows the fundamental flaw in Plaintiffs' theory here and why the goal of a stable value fund to protect against risk of losses is so important. In *Unisys*, the plaintiffs sued because plan fiduciaries allegedly invested in a general account stable value fund that was *too risky* and lost money. 74 F.3d at 437. The Third Circuit explained that the fact that the challenged fund in that case offered a *higher* crediting rate than others was evidence that the "*risk* accompanying [that fund] was *unacceptably high*." *Id.* (emphasis added). By definition, *Unisys* recognizes that all stable value funds do not have the same, or similar, risks. And, per *Unisys*, the fact that the Lincoln Stable Value Separate Account GIC has a lower crediting rate than the comparator funds means it has lower risk than those funds. *See also* Compl., *Harvey v. Bed Bath & Beyond, Inc. 401(K) Savings Plan Comm.*, No. 2:23-cv-20376 (D.N.J. Sept. 14, 2023), Dkt. No. 1 (submitted herewith as Exhibit F) (lawsuit alleging breach of fiduciary duty claim because stable value fund *lost money* and participants would have been better off in a different stable value fund with less risk and more favorable contractual provisions that would have avoided losses).

guidelines, liquidity and participant withdrawal provisions in the contracts. Indeed, Plaintiffs' argument is like saying all "employment contracts" are the same because they all involve employment—regardless of the job responsibilities, duration, pay, benefits, provisions for termination for "cause" or "without cause" (and how those terms are defined), etc. That is not a basis for a meaningful comparison.

Lastly, although Plaintiffs describe three of their comparators as having investment contracts with "Lincoln National Life Insurance Company – the same carrier used in the LSA GIC" (Compl. ¶ 108), the mere fact that other funds might be managed by the same company does not mean that they are meaningful benchmarks for each other. Otherwise, any Vanguard fund could be compared to any other Vanguard fund, and any Fidelity Fund could be compared to any other Fidelity Fund. *See, e.g.*, *Smith*, 37 F.4th at 1164-66 (affirming Rule 12(b)(6) dismissal of claim comparing Fidelity Freedom target date funds to Fidelity Index target date funds). Moreover, the same paragraph of Plaintiffs' Complaint acknowledges that those purported comparator funds are not even separate account funds like the Lincoln Stable Value Separate Account GIC. (Compl. ¶ 108.)

At the end of the day, all the Complaint alleges is that Plaintiffs' proposed comparator funds also have "stable value" in the name. That is not sufficient to allow any inference of imprudence under *Anderson*. As such, Plaintiffs' stable value fund allegations should be dismissed under controlling Ninth Circuit precedent.

**2. Plaintiffs' Challenge to the Lincoln Stable Value Separate Account GIC Fails as a Matter of Law Because Short-Term, Unsubstantial Performance Differences Are Not Enough to State a Plausible Imprudence Claim.**

Plaintiffs' allegations also fail to state a claim because the performance differences they complain about are neither substantial nor consistent enough to allow any inference of imprudence.

For one thing, Plaintiffs allege that their purported comparators had crediting rates that were on average between 1.53% and 2.34% more than the Lincoln Stable Value Separate Account GIC during the cherry-picked time periods identified in the Complaint. (Compl. ¶¶ 108-09.) Because of the nature and goals of stable value funds, however, this is not the sort of "underperformance" that can justify an inference of imprudence. *Barchock*, 886 F.3d at 52 (finding it "unreasonable to infer" that the plan's fund was a "severe outlier" based on similar allegations); *Lalonde v. Mass Mut. Ins. Co.*, 728 F. Supp. 3d 141, 156-57 (D. Mass. 2024) (holding that, where alleged comparator stable value funds outperformed the challenged fund by between 0.75% and 2.5%, those alleged instances of "poor performance [of the challenged stable value fund as compared to other stable value funds] assessed with the benefit of hindsight is not sufficient to infer breach").

For another thing, Plaintiffs do not allege performance differences covering a consistent or sufficiently lengthy period to state a viable claim. None of Plaintiffs' proposed comparators is cited in all five years for which they provide alleged performance information. (Compl. ¶ 109.) And even if Plaintiffs could show five years of consistent underperformance against a particular comparator (which they have not), courts have held that allegations of five years of underperformance are not enough to state a claim. *Beldock v. Microsoft Corp.*, 2023 WL 3058016, at *3 (W.D. Wash. Apr. 24, 2023) (rejecting three- and five-year performance metrics); *Enstrom v. SAS Inst.*, 2025 WL 685219, at *5 (E.D.N.C. Mar. 3, 2025) (same; holding that a "prudent fiduciary may—and often does—retain investments through a period of underperformance as part of a long-range investment strategy, and will not necessarily reflexively jettison investment options in favor of the prior year's top performers because past performance is no guarantee of future success." (citation omitted)); *Hall v. Cap. One Fin. Corp.*, 2023 WL 2333304, at *6 (E.D. Va.

Mar. 1, 2023) ("That the [challenged funds] were allegedly outperformed by some other [funds] at some points during a three- or five-year window, without more, does not suggest that offering the [challenged funds] fell outside the range of reasonable judgments that fiduciaries may make." (citations and quotations omitted)); *Bracalente v. Cisco Sys., Inc.*, 2023 WL 5184138, at *3-4 (N.D. Cal. Aug. 11, 2023) (rejecting plaintiffs' reliance on "severe and consistent three- and five-year performance data"); *Phillips*, 2024 WL 3228097, at *8 ("Plaintiffs lastly argue that the Court should find imprudence based on the sheer length of underperformance. The Court can find no support for drawing such an inference without additional allegations of process failures."). That is all Plaintiffs allege here, and that does not state a claim.

For each of the foregoing reasons, Plaintiffs' challenge to the Lincoln Stable Value Separate Account GIC fails to state a claim and should be dismissed.

### B. Plaintiffs Fail to State a Claim for Breach of Fiduciary Duty Regarding the T. Rowe Price Growth Stock Fund.

*Anderson* similarly compels dismissal of Plaintiffs' challenge to the T. Rowe Price Growth Stock fund. The Complaint fails to allege the strategy, objectives, asset allocations, underlying holdings, or risks of either the T. Rowe Price Growth Stock fund or of *any* of its alleged "comparator" funds. *See supra* at 8. At most, three of Plaintiffs' five "comparators" also have "Growth" in their name, but the allegations regarding any similarity among the funds ends there. *Id*. These allegations fall far short of what is required to state a claim under *Anderson*. As discussed, the Ninth Circuit in *Anderson* held that "the need for a relevant comparator with similar objectives—not just a better-performing plan or investment—is implicit in ERISA's text," and "simply labeling funds as 'comparable' or 'a peer' is insufficient to establish that those funds are meaningful benchmarks against which to compare the performance of the [challenged funds]."

137 F.4th at 1022-23 (citation omitted). That is all the Complaint does here, and that is not enough to state a claim.[9]

The Complaint's comparison to the Russell 1000 Growth Index does not move the needle. In *Anderson*, the plaintiffs similarly alleged that the TDFs underperformed the "category" benchmark indices for target date funds. (*See* Ex. E ¶ 161, and Table 6). But the Ninth Circuit rejected that comparison as insufficient, and this Court should too. *Anderson*, 137 F.4th 1020 (rejecting performance comparisons to "published indices like the S&P 500 and Morningstar categories of peer-group funds"). After all, as many courts have aptly recognized, market indices cannot serve as a "meaningful benchmark" because they are not investments at all. *See, e.g.*, *Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 485 n.4 (8th Cir. 2020) (rejecting "Russell 3000 Index" as a "meaningful benchmark" because "it is not a fund, much less an actively managed one"); *Smith v. CommonSpirit Health*, 2021 WL 4097052, at *8 (E.D. Ky. Sept. 8, 2021) (rejecting Russell 1000 Value Index as a "suitable comparator" because the market index is "not a fund"), *aff'd*, 37 F.4th 1160, 1169 (6th Cir. 2022); *Wehner v. Genentech, Inc.*, 2021 WL 507599, at *10 (N.D. Cal. Feb. 9, 2021) (rejecting comparison to Russell 2000 Index).

[9] *See also* *Phillips*, 2024 WL 3228097, at *8 (dismissing similar claims because plaintiffs failed to allege facts beyond mere "underperformance"); *Bozzini v. Ferguson Enters. LLC*, 2024 WL 4008760, at *1 (N.D. Cal., Aug. 30, 2024) (same); *Partida v. Schenker Inc*., 2024 WL 1354432, at *7 (N.D. Cal. Mar. 29, 2024) (same, concluding that "without factual allegations about the allegedly flawed process for selecting the plans, allegations that a fund 'underperformed' are insufficient for a duty of prudence claim"); *Beldock*, 2023 WL 1798171, at *7 (same, finding that plaintiffs allegations "showed only that [the defendant] could have chosen different vehicles for investment that performed better during the relevant period" and "[n]one of the allegations made it more probable than not that any breach of a fiduciary duty had occurred." (citation omitted)); *Bracalente*, 2023 WL 5184138, at *4 (same; "Plaintiffs' 'underperformance-only' theory . . . would flatten this nuanced prudence evaluation into a one-dimensional comparison that considers only the funds' three- and five-year performance data").

### C. Plaintiffs Fail to State a Claim Regarding the DC Plan's Use of Forfeitures.

Plaintiffs separately challenge the DC Plan's use of forfeitures to offset its employer contributions. Plaintiffs claim that the Plan was required to use forfeitures to pay Plaintiffs' share of the Plan's administrative expenses, and that it violated ERISA by not doing so. These allegations fail to state a claim. Neither ERISA nor the terms of the Plan here prohibit the conduct about which Plaintiffs complain or require the Plan to use forfeitures to pay Plaintiffs' expenses. And Congress, regulatory guidance, and the courts have consistently recognized that plans are allowed to use forfeitures *exactly the way the Plan does here*.

For these reasons, and those set forth more fully below, courts have rejected identical allegations and dismissed the same claims alleged by Plaintiffs here. *Wright*, 2025 WL 1683642, at *3-5 (dismissing forfeiture claims); *Hutchins II*, 767 F. Supp. 3d at 921-28 (same); *Madrigal*, 2025 WL 1299002, at *3-5 (same); *Sievert*, 780 F. Supp. 3d at 876-79 (same); *McWashington*, 2025 WL 1736765, at *12-15 (same); *Dimou v. Thermo Fisher Sci. Inc.*, 2025 WL 2611240, at *6-7 (S.D. Cal. Sept. 9, 2025) ("*Dimou II*") (same), *appeal docketed*, No. 25-6364 (9th Cir. Oct. 9, 2025); *Dimou v. Thermo Fisher Sci. Inc.*, 2024 WL 4508450, at *9 (S.D. Cal. Sept. 19, 2024) ("*Dimou I*"); *Barragan v. Honeywell Int'l Inc.*, 2025 WL 2383652, at *4 (D.N.J. Aug. 18, 2025) ("*Barragan II*") (same), *appeal docketed*, No. 25-2609 (3d Cir. Aug. 22, 2025); *Barragan v. Honeywell Int'l Inc.*, 2024 WL 5165330, at *4-5 (D.N.J. Dec. 19, 2024) ("*Barragan I*") (same); *Fumich v. Novo Nordisk Inc.*, 2025 WL 2399134, at *6-7 (D.N.J. Aug. 19, 2025) (same); *Middleton v. Amentum Parent Holdings, LLC*, 2025 WL 2229959, at *14-15 (D. Kan. Aug. 5, 2025) (same); *Naylor v. BAE Sys., Inc.*, 2024 WL 4112322, at *3-6 (E.D. Va. Sept. 5, 2024) (same); *Cain v. Siemens Corp.*, 2025 WL 2172684, at *5 (D.N.J. July 31, 2025) (same), *appeal docketed*, No. 25-2564 (3d Cir. Aug. 19, 2025); *Steen v. Sonoco Prods. Co.*, 2025 WL 2420725, at *4-5

(D.S.C. June 4, 2025) (same); *Cano v. The Home Depot, Inc.*, 2025 WL 2589567, at *4-6 (N.D. Ga. Aug. 26, 2025) (same), *appeal docketed*, No. 25-13158 (11th Cir. Sept. 15, 2025); *Armenta v. WillScot Mobile Mini Holdings Corp.*, 2025 WL 2645518, at *5-6 (D. Ariz. Sept. 15, 2025) (same); *Estay v. Ochsner Clinic Found.*, 2025 WL 2644782, at *2-5 (E.D. La Sept. 15, 2025) (same). This Court should do the same.

### 1. ERISA Does Not Require Increasing Plaintiffs' Benefits Under the DC Plan.

To start, Plaintiffs' central theory—that Legacy Health was required to pay more toward their retirement savings by paying a portion of Plaintiffs' administrative expenses—contradicts the fundamental principles of ERISA. Congress enacted ERISA to ensure that employees receive the benefits promised to them, but Congress did not legislate what those benefits should be, or even whether those benefits should be provided in the first place. *See* *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 446 (1999); *Hlinka v. Bethlehem Steel Corp.*, 863 F.2d 279, 283 (3d Cir. 1988) ("ERISA nowhere mandates the institution of a pension program. . . . ERISA is not a direction to employers as to what benefits to grant their employees."). Accordingly, a plan's written plan document defines the rights and obligations of the employer and the participants under the plan. *See, e.g.*, *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 100-01 (2013) ("The statutory scheme, we have often noted, is built around reliance on the face of written plan documents." (quotations and citation omitted)); *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995) ("A written plan is to be required in order that every employee may, *on examining the plan documents*, determine exactly what his rights and obligations are under the plan." (citation omitted)).

Here, Plaintiffs do not claim that they or any other participant ever received less than the full matching contributions the DC Plan promised them. And Plaintiffs do not dispute that the Plan expressly authorizes Legacy Health to allocate forfeitures toward employer contributions—

thereby using those forfeitures to provide benefits to other participants. (Compl. ¶ 76.) Nevertheless, Plaintiffs claim that ERISA requires Defendants to give them *more* than the Plan requires by not only making employer-matching contributions but also by paying administrative costs that are generally borne by participants.

This "greater benefit" theory is inconsistent with ERISA. After all, employers are under no obligation to offer *any* benefits to their employees. In enacting ERISA, Congress did not require employers to pay a plan's administrative expenses; to the contrary, such costs may be—and routinely are—lawfully borne by plan participants. *See, e.g.*, *Loomis v. Exelon Corp.*, 658 F.3d 667, 671 (7th Cir. 2011) ("ERISA does not create any fiduciary duty requiring employers to make pension plans more valuable to participants" by paying plan expenses), *abrogated on other grounds by Hughes v. Nw. Univ.*, 63 F.3d 615 (7th Cir. 2023). Instead, ERISA's primary concern with respect to administrative costs is that those costs be "reasonable." 29 U.S.C. § 1104(a)(1)(A)(ii) (fiduciaries are responsible for "defraying reasonable expenses of administering the plan"). Here, unlike hundreds of other recent ERISA class actions, Plaintiffs do not allege that *any* of the Plan's administrative costs were unreasonable, or that they paid anything other than the routine costs of Plan administration. Instead, they allege that Legacy Health should have borne the cost of all such expenses. Nothing in ERISA requires this. As Judge Staton recently explained in rejecting the same theories:

> The Court is persuaded by *Hutchins* and its progeny, all of which concluded that breach of fiduciary duty claims like the one presented here seek to stretch the fiduciary duties of loyalty and prudence beyond what ERISA requires. Like in *Hutchins*, "the import of Plaintiff's allegations is that, if given the option between using forfeited funds to pay administrative costs or to reduce employer contributions, a fiduciary is *always* required to choose to pay administrative costs." *Hutchins I*, 737 F. Supp. 3d at 862 (emphasis in original). This theory runs contrary to the Supreme Court's instruction that the plausibility of allegations of breach of fiduciary duty is a "context specific" inquiry dependent on the particular circumstances at issue. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421 (2014). Moreover, this theory ignores that ERISA does not require fiduciaries to "maximize pecuniary benefits" or to "resolve every issue of interpretation in favor

> [of] plan beneficiaries." *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1100 (9th Cir. 2004).

*Wright*, 2025 WL 1683642, at *5; *see also* *Hutchins v. HP Inc.*, 737 F. Supp. 3d 851, 862 (N.D. Cal. 2024) ("*Hutchins I*") (reaching the same conclusion); *Sievert*, 780 F. Supp. 3d at 877 (same); *Middleton*, 2025 WL 2229959, at *14-15 (same); *Madrigal*, 2025 WL 1299002, at *4 (same); *Dimou I*, 2024 WL 4508450, at *9 (same); *McWashington*, 2025 WL 1736765, at *15 n.28 (same); *Barragan II*, 2025 WL 2383652, at *4 (same); *Estay*, 2025 WL 2644782, at *5 (same). Plaintiffs here assert the same theory, and their claims fail as a matter of law for the same reasons.

**2. Plaintiffs' Breach of Fiduciary Duty Claims Are Foreclosed by Decades of Settled Law Permitting the Use of Forfeitures to Provide Benefits to Other Plan Participants.**

**a. Congressional and Regulatory Background.**

Well-established caselaw and longstanding IRS guidance also contradict Plaintiffs' theory. The law has always recognized what is really just common sense—forfeited contributions are still *employer* contributions, made at a prior time and no longer allocated to any individual plan participant. There is nothing nefarious or improper about allowing such forfeitures to be used to fund other benefits called for by that plan's terms.

Like any tax-qualified plan, the Plan is subject to numerous requirements set forth in the Tax Code. Adherence to those "qualification requirements" ensures both the deductibility of the employer's contributions and the tax deferral of employer contributions, employee contributions, and earnings thereon. *See* 26 U.S.C. § 401. From the outset, ERISA and the Tax Code have been inextricably intertwined; in fact, ERISA amended the Tax Code and is the source of many of the Code's qualification requirements.[10] Congress even requires the Treasury Department and

[10] *See, e.g.*, Dep't of Labor, History of EBSA and ERISA, *available at* https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/history-of-ebsa-and-erisa (last visited Oct. 31, 2025) ("Title II of ERISA, which amended the Internal Revenue Code to parallel many of the Title I rules, is administered by the IRS.").

Department of Labor to coordinate in enforcing ERISA, to the extent the statutes overlap. 29 U.S.C. § 1204. The Treasury Department, in turn, has promulgated many regulations with which a plan must comply to remain tax-qualified.

Much like ERISA, the Tax Code mandates that assets in a tax-qualified trust must not be "used for, or diverted to, purposes other than for the exclusive benefit of" the employees and beneficiaries for whom the trust is established. 26 U.S.C. § 401(a)(2); *see also* 26 C.F.R. § 1.401-2; *compare* 29 U.S.C. § 1103(c)(1) (using similar "exclusive purpose" language in Title I of ERISA). Notwithstanding the Tax Code's exclusive-purpose requirement, Treasury regulations have expressly authorized—since *before* ERISA was enacted—the use of forfeited employer contribution amounts to reduce or offset future employer contributions. Specifically, 26 C.F.R. § 1.401-7(a) requires that forfeitures "must be used as soon as possible to *reduce the employer's contributions* under the plan." (emphasis added); *see also* Rev. Ruling 67-68, 1967-1 C.B. 86.

Consistent with § 1.401-7(a), both the Treasury Department and Congress have made clear over the ensuing six decades that a defined contribution plan may use forfeitures to provide benefits to other participants (thereby reducing future employer contributions). For example, a 1971 IRS Revenue Ruling explained that a qualified plan under section 401(a)—such as the DC Plan in this case (*see* Compl. ¶ 19)—"may provide that forfeitures be used *to reduce employer contributions* that otherwise would be required under the contribution formula contained in the plan." Rev. Ruling 71-313, 1971-2 C.B. 203, 1971 WL 26693 (1971) (emphasis added). The IRS issued similar guidance in 2010, advising that forfeitures "may be used to pay for a plan's administrative expenses and/or to *reduce employer contributions*," and also observing that "it may be appropriate to take the non-current-year forfeitures and *use them as employer contributions* for the current plan year." IRS, RETIREMENT NEWS FOR EMPLOYERS 4-5 (Vol. 7, Spring 2010), https://www.irs.gov/pub/irs-pdf/p4278.pdf (emphases added). The Internal Revenue Manual also confirms forfeitures in a defined contribution plan "must be allocated to the remaining participants

or used *to reduce the employer contributions* that are otherwise required under the plan." IRM § 7.12.1.9(6), *Forfeitures* (02-16-2017), 2007 WL 9649931, https://www.irs.gov/irm/part7/irm_07-012-001#idm139730277532416 (emphasis added). This list could go on—but the point is that there can be no legitimate dispute that using forfeitures (as the Plan does) has been widely authorized and accepted for decades.

Other Treasury regulations confirm that forfeitures may be allocated to employer contributions. For example, in 2018, the Treasury Department issued final regulations that expressly "permit forfeitures of prior contributions to be used to fund" qualified matching contributions ("QMACs") and qualified non-elective contributions ("QNECs"). 83 Fed. Reg. 34469, 34470 (July 20, 2018). Both are specific types of contributions an employer may make to satisfy nondiscrimination rules under the Tax Code.[11] And the main reason for this regulation was the IRS's recognition that, before it took effect, the Treasury Department understood that plans were allowed to use forfeitures to reduce employer contributions generally, but could not apply such amounts to QMACs or QNECs. *Id.* (noting prior regulation "preclude[d] plan sponsors with plans that permit the use of amounts in plan forfeiture accounts to *offset future employer contributions under the plan* from applying such amounts to fund QMACs and QNECs" (emphasis added)). In other words, the Treasury Department adopted these regulations to place QMACs and QNECs on equal footing with other employer contributions, such that forfeitures can be used to satisfy *any* type of employer contribution.

Congress has confirmed the same understanding about the use of forfeitures as the Treasury Department. For example, the Tax Reform Act of 1986 amended 26 U.S.C. § 401(a)(8)—which

[11] *See* IRS, *Issue Snapshot—Plan Forfeitures Used for Qualified Nonelective and Qualified Matching Contributions* (Apr. 2025), https://www.irs.gov/retirement-plans/issue-snapshot-plan-forfeitures-used-for-qualified-nonelective-and-qualified-matching-contributions (last visited Oct. 31, 2025).

prohibits using forfeitures to "increase the benefits any employee would otherwise receive"—to clarify that this prohibition applies only to defined benefit plans. *See* Pub. L. No. 99-514, 100 Stat. 2085, § 1119(a) (1986). In explaining the bill, however, the House Conference Report made clear that under existing law, "forfeitures arising in *any defined contribution plan* . . . can be either (1) reallocated to the accounts of other participants in a nondiscriminatory fashion, or (2) used to *reduce future employer contributions* or administrative costs." H.R. Rep. No. 99-841, Vol. II at 442 (1986) (emphases added). The Treasury Department recently recounted this history when proposing new regulations, highlighting Congress's intent in 1986 to "provide[] uniform rules regarding the use of forfeitures under any defined contribution plan." 88 Fed. Reg. 12282-01, 12,282-83 (Feb. 27, 2023).

Finally, in 2023, the Treasury Department proposed a new regulation to clarify the permissible use of forfeitures in defined contribution plans. And, in doing so, it reaffirmed the same understanding that both the Treasury Department and Congress have expressed for more than fifty years. The proposed regulation requires a defined contribution plan to provide that forfeitures "will be used" for one or more of three lawful purposes: "(i) To pay plan administrative expenses; (ii) *To reduce employer contributions under the plan*; or (iii) To increase benefits in other participants' accounts in accordance with plan terms." 88 Fed. Reg. at 12,285 (emphasis added). The proposed regulation, like the existing one, explicitly authorizes the very conduct Plaintiffs challenge. To accept Plaintiffs' theory, therefore, would mean the Treasury Department continues to authorize a practice that simultaneously constitutes a *per se* violation of ERISA. That is not plausible.[12]

[12] Legacy Health acknowledges that this regulation is not final. But its very existence shows that Plaintiffs have no legal or factual basis for claiming that Legacy Health's conduct violated ERISA. And the Ninth Circuit has explained that "a proposed regulation is entitled to respect if it has the

**b. Plaintiffs' Theory of Liability Contradicts This Established Law.**

Consistent with the legislative and regulatory background summarized above, neither Congress nor the Treasury Department has *ever* sought to prohibit employers from using forfeitures to reduce future employer contributions. To the contrary, the fact that Congress and the Treasury Department permit the very conduct Plaintiffs challenge shows that the challenged conduct does not violate ERISA. *See* *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986) ("[W]hen Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." (quotations and citation omitted)); *Douglas v. Xerox Bus. Servs., LLC*, 875 F.3d 884, 889 (9th Cir. 2017) ("That Congress has made changes to the [disputed] provision without disturbing the explicit agency and judicial decisions is not without significance.").

In contrast, *none* of the ERISA provisions Plaintiffs cite mentions anything about forfeitures—let alone prohibits using them just as Treasury regulations have always allowed. *See* *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015) (recognizing that a statute's silence should be construed "as exactly that: silence"). Plaintiffs rely instead on generic concepts under ERISA's fiduciary and anti-inurement provisions—all of which address conduct distinct from the decisions challenged here. It is nonsensical to suggest that statutory provisions that do not even mention forfeitures prohibit using them to offset employer contributions when both existing and proposed regulations allow it. *See* *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 261-62 (1993) ("[V]ague notions of a statute's 'basic purpose' are . . . inadequate to overcome the words of its text," which is "especially true with legislation such as ERISA, an enormously complex and

---

power to persuade." *Plancarte Sauceda v. Garland*, 23 F.4th 824, 832 (9th Cir. 2022) (quotations omitted).

detailed statute that resolved innumerable disputes between powerful [and] competing interests—not all in favor of potential plaintiffs."); *Christensen v. Harris Cnty.*, 529 U.S. 576, 585 (2000) (noting that a practice is not barred by a statute that "says nothing" about it).

Numerous courts have rejected virtually identical claims, in part because the plaintiffs' theory of liability directly contradicted the "decades of settled law" summarized above. *Hutchins II*, 767 F. Supp. 3d at 922-23. As *Hutchins II* correctly held, and as is equally true in this case, allowing plaintiffs to state a claim under these circumstances "would be contrary to the Plan and to ERISA." *Id.* at 923. In just the few months since the *Hutchins II* decision, numerous courts have rejected this same theory of liability. *See, e.g.*, *Cain*, 2025 WL 2172684, at *5 (dismissing forfeiture claim because "Plaintiff's theory also contravenes the understanding of both Congress and the Treasury Department that ERISA permits plan administrators to use forfeitures to reduce employer contributions."); *Steen*, 2025 WL 2420725, at *4-5 (same); *Sievert*, 780 F. Supp. 3d at 878-79 (same); *McWashington*, 2025 WL 1736765, at *14-15 (same); *Fumich*, 2025 WL 2399134, at *6-7 (same); *Middleton*, 2025 WL 2229959, at *14-15 (same); *Barragan I*, 2024 WL 5165330, at *4-5 (same); *Cano*, 2025 WL 2589567, at *5-6 (same); *Armenta*, 2025 WL 2645518, at *5 (same). And even the Department of Labor agrees, having recently filed an amicus brief in support of the defendants in the *Hutchins* case before the Ninth Circuit. *Hutchins v. HP Inc.*, No. 25-826 (9th Cir. July 9, 2025), Dkt. No. 24-1 (submitted herewith as Exhibit G).

At bottom, Plaintiffs' Complaint relies on the false premise that using amounts forfeited by unvested Plan participants to reduce employer contributions in a later year somehow constitutes a windfall to Legacy Health. This is simply not accurate—which is why neither Congress nor any federal agency has ever barred employers from using forfeitures in this way. And, notably, Plaintiffs do not claim that forfeitures were removed from the DC Plan. Rather, they allege that those funds *remain* in the DC Plan and are simply reallocated to other participants' accounts. In other words, the forfeitures are used to "provid[e] benefits to participants," 29 U.S.C. § 1103(c)(1),

just as ERISA requires. As a matter of basic economics and math, forfeitures constitute money that Legacy Health contributed for participants, and they are being used *for exactly that*.

The fundamental flaw in Plaintiffs' legal theory also becomes clear when you consider that "forfeitures" are no different from any other employer contributions except for the timing of when they are made. According to Plaintiffs, these amounts became plan assets when they were contributed—a few months or years earlier—and, as a result, ERISA fiduciary duties require them to now be used to pay DC Plan expenses. But the statutes Plaintiffs rely on do not distinguish between contributions made two years ago, two months ago, two days ago, or two minutes ago. They all become plan assets as soon as they are contributed. So, by Plaintiffs' logic, if ERISA's duty of loyalty or prudence requires that contributions made two years ago now be used to pay plan expenses, then those same duties would require that a contribution made two minutes ago, or two seconds ago—before even being allocated to a participant account—be used to pay plan expenses. And after all, just like with forfeitures, the employer could just keep contributing more and more money until all the plan's expenses are paid and all the promised contributions are added to participant accounts.

Of course, ERISA does not require that absurd result. Plaintiffs' claims have no legal foundation and should be dismissed for these overarching reasons.

**c. Plaintiffs' Breach of Fiduciary Duty Claims Fail Under the Precedent and Regulatory Guidance Explained Above.**

Although Plaintiffs assert in conclusory fashion that Legacy Health breached ERISA's duties of prudence and loyalty, the alleged "breach" is only that Legacy Health used forfeitures exactly as the Plan and long-settled law allow. There is no support in either the law or the Plan for finding that ERISA *required* Legacy Health to use forfeitures in the way Plaintiffs would prefer.

To the contrary, ERISA requires that a fiduciary discharge his or her duties "in accordance with the documents and instruments governing the plan insofar as such documents and instruments

are consistent with the provisions of this subchapter and subchapter III." 29 U.S.C. § 1104(a)(1)(D). As Ninth Circuit precedent makes clear, a fiduciary does not breach its duties under ERISA by acting in compliance with the lawful terms of a plan document. *See* *Wright*, 360 F.3d at 1100 ("Because Defendants complied with the Plan's lawful terms and were under no legal obligation to deviate from those terms"—which limited how much employer stock participants could sell—"they provided Plaintiffs with their benefits due"). And Plaintiffs here have not alleged that the Plan document itself contains unlawful terms. *See* *Wright*, 2025 WL 1683642, at *3 ("Plaintiff also does not contest that the law allows Defendants to use forfeited funds to reduce employer contributions; indeed, any theory to the contrary would mark a significant departure from decades of well-settled precedent.").

Further, a separate provision of ERISA provides that "[n]othing [in ERISA] shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States . . . or *any rule or regulation issued under any such law*." 29 U.S.C. § 1144(d) (emphasis added). As such, "[t]here can be no violation of ERISA itself" by following other federal regulations—such as the Treasury regulations under the Tax Code that specifically allow using forfeitures just as Plaintiffs allege they were used here. *See* *First Nat'l Bank of Chi. v. Comptroller of Currency of U.S.*, 956 F.2d 1360, 1368 (7th Cir. 1992). The Department of Labor has agreed, including in the specific context of Treasury regulations promulgated under the Tax Code. *See, e.g.*, DOL Adv. Op. 79-90A, 1979 WL 7027, at *3 (Dec. 28, 1979) (advising that "pursuant to ERISA section 514(d)," fiduciaries that comply with a section of the Tax Code are not "in violation of ERISA sections 403(c)(1) and 404(a)(1)").

Plaintiffs' own allegations establish that the Plan here expressly permits the use of forfeited amounts to fund employer contributions. (Compl. ¶ 76.) The Complaint does not (and could not) contend that this Plan provision is not "consistent with" ERISA, so it must be followed. 29 U.S.C. § 1104(a)(1)(D). For these reasons, courts consistently reject the same claims Plaintiffs assert here.

*See Wright*, 2025 WL 1683642, at *3-5 (dismissing forfeiture claims where it was "undisputed that the [plan] give[s] Defendants discretion to use forfeitures to reduce their own contributions"); *Hutchins II*, 767 F. Supp. 3d at 925 (dismissing forfeiture claims where the alleged use of forfeitures to reduce employer contributions "complied with the Plan's lawful terms" (citation omitted)); *Madrigal*, 2025 WL 1299002, at *4 (same); *Sievert*, 780 F. Supp. 3d at 881 (dismissing forfeiture claims where "the explicit terms of the Plan do not *mandate* that Defendant use forfeitures to pay Plan expenses, but rather give Defendant discretion over forfeiture allocations"); *McWashington*, 2025 WL 1736765, at *13 (dismissing forfeiture claims where the use of forfeitures to reduce employer contributions was "dictated by the Plan's terms"); *Barragan I*, 2024 WL 5165330, at *4 (dismissing forfeiture claims where "the Plan authorized [the employer's] decision to allocate forfeited amounts to reduce employer contributions"); *Fumich*, 2025 WL 2399134, at *7 (holding that "[t]he text of the Plan," which permitted the use of forfeitures to reduce employer contributions, was "fatal to Plaintiffs' allegations"); *Middleton*, 2025 WL 2229959, at *14 (dismissing forfeiture claims where "the Plans' terms explicitly allow for the use of forfeited funds as company contributions *or* administrative expenses" (emphasis added)); *Naylor*, 2024 WL 4112322, at *6 (dismissing forfeiture claims where "Plaintiff's position regarding forfeitures reduce to an argument that Defendant was required by ERISA to disregard the terms of the Plan"); *Cano*, 2025 WL 2589567, at *4 (dismissing forfeiture claims where the plan "expressly permit[ted]" the company to either use forfeited funds to pay reasonable administrative expenses *or* to reduce the company's contribution obligations).

In short, Plaintiffs' claims fail because Legacy Health's conduct was consistent with the terms of the DC Plan and longstanding precedent and guidance.

**D. Plaintiffs Fail to Plausibly Allege a Violation of ERISA's Anti-Inurement Clause.**

The Court should also dismiss Count III, which alleges that using forfeited amounts to fund future contributions violates ERISA's "anti-inurement" provision, 29 U.S.C. § 1103(c)(1). That theory of liability is a non-starter.

ERISA's anti-inurement provision states that "the assets of a plan . . . shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1103(c)(1). Plaintiffs concede that forfeitures are not removed from the Plan but instead remain in the Plan to be allocated to other participants as a method of providing benefits to those individuals. (Compl. ¶ 19.) In other words, the Plan uses forfeitures for "providing benefits to participants," just as ERISA requires. 29 U.S.C. § 1103(c)(1); *see also* *Hughes Aircraft*, 525 U.S. at 442 (noting that ERISA's "exclusive purpose" language "focuses exclusively on whether fund assets were used to pay pension benefits to plan participants"); *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 22 (2004) ("The [anti-inurement] provision demands only that plan assets be held for supplying benefits to plan participants.").

As the Supreme Court put it, where plaintiffs "do not allege that [defendant] used any of the assets for a purpose other than to pay its obligations to the Plan's beneficiaries," there is no ERISA violation. *Hughes Aircraft*, 525 U.S. at 443. That is precisely the case here. Plaintiffs "do not allege that [Legacy Health] used any" assets of the Plan for any "purpose other than to pay its obligations" to participants. *Id.* The fact that Legacy Health might ultimately contribute less additional money to the Plan in a given year is immaterial, so long as the assets *within the Plan* were used to pay benefits. *See* *id.* (rejecting argument that employer violated ERISA's anti-inurement provision by directing surplus plan assets toward funding a new benefit structure in the

same plan); *see also* *Collins v. Pension & Ins. Comm. of S. Cal. Rock Prods.*, 144 F.3d 1279, 1282 (9th Cir. 1998) (holding that "future contributions not yet made" to a retirement plan *are not* "plan assets" under ERISA). And in *Hughes Aircraft*, the Supreme Court made clear that ERISA does not prohibit actions that are otherwise lawful simply because they may benefit the employer indirectly. 525 U.S. at 445-46 (finding lower labor costs and other "incidental benefits" are not impermissible under ERISA).[13]

For these reasons, courts have consistently rejected anti-inurement claims challenging the use of forfeitures to offset employer contributions. *E.g.*, *Wright*, 2025 WL 1683642, at *6-7; *Hutchins I*, 737 F. Supp. 3d at 866 (dismissing same theory); *Sievert*, 780 F. Supp. 3d at 879-80 (same); *Madrigal*, 2025 WL 1299002, at *5-6 (same); *Dimou I*, 2024 WL 4508450, at *10 (same); *Naylor*, 2024 WL 4112322, at *7 (same); Order, *Cano*, No. 1:24-cv-03793, Dkt. No. 34 at 13-14 (same); *see also, e.g.*, *Barragan I*, 2024 WL 5165330, at *6 ("Barragan alleges the forfeitures, which remain in the Plan, fund Honeywell's contribution obligations for other Plan participants. As these forfeited amounts do not leave the Plan and are used to satisfy Honeywell's obligations according to the Plan's language, the Court finds Honeywell is not acting in violation of the anti-inurement provision."); *Steen*, 2025 WL 2420725, at *6 ("Consistent with this, courts have repeatedly held that the internal reallocation of forfeited contributions within a plan, when

---

[13] *See also* *Lockheed Corp. v. Spink*, 517 U.S. 882, 892-93 (1996) (finding that using surplus funds to offer early retirement benefits was lawful under ERISA); *Commc'ns Workers of Am. v. Alcatel-Lucent USA, Inc.*, 2018 WL 4908281, at *8 (D.N.J. Oct. 10, 2018) ("The fact that Alcatel may have saved money as a result of such transfers does not give rise to an ERISA violation," including an anti-inurement claim); *Krohnengold v. N.Y. Life Ins. Co.*, 2022 WL 3227812, at *10 (S.D.N.Y. Aug. 10, 2022) ("[A]llegations of 'indirect' benefits inuring to an employer are insufficient to state an anti-inurement claim under Section 403(c)(1)."); *Holliday v. Xerox Corp.*, 732 F.2d 548, 550-51 (6th Cir. 1984) (finding "no violation of either the letter or the spirit of ERISA" where employer transferred funds from one pension account to offset amounts it would have to contribute for benefits under a different pension account, despite that this "ultimately had the effect of reducing the amount of money" the employer had to contribute).

conducted in accordance with plan terms, does not violate the anti-inurement provision because the assets remain inside the plan and continue to serve the interests of participants.").

Finally, it warrants emphasizing that Plaintiffs' same anti-inurement theory could be lodged against *every* retirement plan that uses forfeited amounts to reduce future employer contributions—a standard practice Congress and federal regulators have permitted for decades—regardless of what the plan terms provide. In essence, Plaintiffs ask the Court to hold that it is *always* unlawful to apply forfeitures toward ongoing employer contributions. If that is what Congress intended in enacting ERISA's anti-inurement provisions (or ERISA's fiduciary and prohibited transaction provisions, for that matter), then Congress would have said so in 1974 or at any time since. Congress has not done so, and this Court should not accept Plaintiffs' invitation to hold differently.

### E. Plaintiffs' Derivative Duty-to-Monitor Claim Also Fails.

In Count IV, Plaintiffs claim that Legacy Health and its Board of Directors violated a "duty to monitor" the Committee, to ensure the Committee was satisfying its own distinct duties under ERISA. (Compl. ¶¶ 172-78.) This claim is wholly derivative of Plaintiffs' other claims. Because those other claims fail, Count IV does as well. *See, e.g.*, *Bracalente*, 2023 WL 5184138, at *6 (dismissal of fiduciary-breach claim requires dismissal of monitoring claim); *Patterson v. Cap. Grp. Cos.*, 2018 WL 748104, at *6 (C.D. Cal. Jan. 23, 2018) (dismissing monitoring claim because "none of Plaintiff's other causes of action states a claim").

## V. CONCLUSION

For all of the foregoing reasons, the Court should dismiss Plaintiffs' Complaint in its entirety.

Dated: October 31, 2025

Respectfully submitted,

*/s/ Thomas R. Johnson*

Thomas R. Johnson (OSB No. 010645)
Alexandra Choi Giza (OSB No. 214485)
STOEL RIVES LLP
760 SW Ninth Ave., Suite 3000
Portland, OR 97205
Tel: 503.224.3380
Fax: 503.220.2480
tom.johnson@stoel.com
alexandra.giza@stoel.com

Jeremy P. Blumenfeld (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
2222 Market Street
Philadelphia, PA 19103
Tel: 215.963.5000
Fax: 215.963.5001
jeremy.blumenfeld@morganlewis.com

Keri L. Engelman (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110
Tel: 617.341.7700
Fax: 617.341.7701
keri.engelman@morganlewis.com
*Attorneys for Defendants*