IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| JEFFERY FOLEY; JULIANNE GRIFFIN; RANDY REYES; and SHLONDA WHITE, each individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>LEGACY HEALTH; THE BOARD OF DIRECTORS OF LEGACY HEALTH; and THE LEGACY HEALTH RETIREMENT COMMITTEE,<br><br>Defendants. | Case No.: 3:25-cv-01041-AN<br><br>OPINION AND ORDER |

In this Employee Retirement Income Security Act ("ERISA") action, plaintiffs allege that defendants breached their fiduciary duties by including poor investments in their retirement plans and using funds forfeited by plan participants to reduce future employer contributions instead of paying the plan's administrative costs. Defendants now move to dismiss plaintiffs' first amended complaint in its entirety. Upon review of the parties' filings, the Court finds this matter appropriate for decision without oral argument. *See* Local R. 7-1(d). For the reasons stated herein, defendant's motion is GRANTED, and the first amended complaint is DISMISSED with leave to amend.

## LEGAL STANDARD

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012). To be entitled to a

presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The court must draw all reasonable inferences from the factual allegations in the plaintiff's favor. *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The court need not, however, credit a plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

At the motion to dismiss stage, courts may consider "allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice[,]" as well as "a writing referenced in a complaint but not explicitly incorporated therein if the complaint relies on the document and its authenticity is unquestioned." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007).

## BACKGROUND

### A. Factual Background

#### 1. *The Parties*

Legacy Health ("Legacy" or the "Company") is a nonprofit healthcare system that operates dozens of clinics and employs thousands of providers in the Portland area. 1st Am. Compl. ("FAC"), ECF 18, ¶ 34. Legacy offers its employees the opportunity to participate in various retirement plans, which are administered by the Legacy Health Retirement Committee (the "Committee"). *Id.* ¶ 41. Legacy, members of the Committee, and members of the Board of Directors of Legacy Health (the "Board") all serve as plan fiduciaries. *Id.* ¶¶ 38-39, 44.

Plaintiffs Jeffery Foley, Julianne Griffin, Randy Reyes, and Shlonda White all worked for Legacy at some point, and all participated in Legacy's retirement plans during their employment. *Id.* ¶¶ 26-29. Plaintiffs have now brought this suit, individually and on behalf of all others similarly situated, against Legacy, the Board, and the Committee (together, "defendants").

2. *The Plans*

At issue are two retirement plans that Legacy offers to its employees: the Legacy Health 403(b) Plan (the "403(b) Plan") and the Legacy Health Defined Contribution Retirement Plan, which is also referred to as the Legacy Health 401(a) Matched Savings Plan (the "401(a) Plan" and together, the "Plans"). *Id.* at 1. The 403(b) Plan is a defined contribution profit sharing plan, while the 401(a) Plan is a noncontributory defined contribution plan. *Id.* ¶¶ 53, 63. Employees are automatically enrolled into the 403(b) Plan and participants are fully vested in their contributions. *Id.* ¶¶ 57-58. As to the 401(a) Plan, "[e]mployees are generally eligible to receive employer matching contributions" after their first year of employment. *Id.* ¶ 68. The "amount of an eligible participant's nonelective contribution for each plan year," the matching contribution rate, and the applicable vesting percentage are all determined by the length of the employee's service. *See id.* ¶¶ 69-73. The vesting rate for employer-matching contributions ranges from 0% for employees who have worked at Legacy for less than one year to 100% for employees who have worked for more than five years. *Id.* ¶ 72. Employer nonelective contributions only vest once the employee has worked at Legacy for three years. *Id.* ¶ 73. Unvested portions of accounts are forfeited. *Id.* ¶ 74.

Under the Committee Charter, fiduciaries must administer the Plans "solely in the interest of the Plan participant and beneficiaries" and "for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying the reasonable expenses of administering the plans." *Id.* ¶ 77. However, "[p]laintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plans, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plans' investments." *Id.* ¶ 91.

Plaintiffs' challenge how defendants handled these Plans in three ways: first, plaintiffs argue that

the 403(b) Plan's investments in a the Lincon Stable Value Separate Account ("LSA GIC") were imprudent; second, plaintiffs argue that defendants imprudently investment assets from both Plans in the T. Rowe Price Growth Stuck Fund ("TRP Growth Fund"); and third, plaintiffs argue that defendants wrongfully used 401(a) Plan forfeitures to offset future employer contributions instead of paying down administrative expenses. Background details on each aspect are provided below.

3. *The LSA GIC*

Plaintiffs challenge the investment of certain 403(b) Plan assets in the LSA GIC. The LSA GIC is a stable value fund, which is also referred to as a Guaranteed Investment Contract, or GIC. GICs are "issued by insurance companies in the form of a fixed annuity contract" and "provide for a guaranteed rate of return or 'crediting rate' during a specified period." *Id.* ¶ 98.

Several types of GICs exist in the retirement plan marketplace: "'synthetic' stable value funds . . . are the least risky, because principal is guaranteed by multiple 'wrap providers' and the fund owns the assets of the underlying funds." *Id.* ¶ 99. "Separate account products, where the assets of the underlying funds are held in the separate account of an insurance carrier are riskier, because there is only one 'wrap' provider." *Id.* ¶ 100. Separate account GICs "offer higher crediting rates" because they are "are putatively backed by a separate account, which is less susceptible to claims and liabilities against the insurer." *Id.* "General account products . . . where the funds are held unrestricted in the general account of the insurance carrier," offer the highest crediting rates because they "are the riskiest type of stable value funds." *Id.* ¶ 101. General account GICs "are generally subject to claims and liabilities asserted against the insurer. . . If the insurer fails to pay funds, no other entity will satisfy the loan." *Id.* ¶ 102. General account GICs are thus most "vulnerable to single entity credit risk." *Id.* ¶ 101.

The LSA GIC is a separate account GIC.[1] *Id.* ¶¶ 15, 59. The crediting rate for the LSA GIC "is

[1] When describing GICs more generally, plaintiffs imply that the LSA GIC is a general account GIC: "And General account products, ***such as the LSA GIC***…" FAC ¶ 101 (emphasis added). However, this is contradicted by plaintiffs direct allegations about the LSA GIC, which state, "Defendants allowed substantial assets in the Plans to be invested ***in a separate account GIC*** with Lincoln National Life Insurance Company (the Lincon Stable Value ***Separate Account*** GIC)," and that "the 403(b) Plan's available funds were guaranteed investment contracts that consist of the Lincoln Stable Value ***Separate***

reviewed on a semi- annual basis for resetting," although its "contract cannot be terminated before the scheduled maturity date." *Id.* ¶ 104. The Plans' "ability to receive amounts due in accordance with the fully benefit-responsive investment contract is dependent on the issuer's ability to meet its financial obligations." *Id.*

Plaintiffs allege that "[t]hroughout the Class Period," meaning from June 17, 2025, through the date of judgment in this action, "identical or substantially identical stable value funds with higher crediting rates were available to the Plans but were not selected by Defendants." *Id.* ¶¶ 46, 107. Plaintiffs name thirteen such comparators:

(1) The "Pomona Valley Hospital Medical Center Retirement Savings Plan's fully benefit-responsive synthetic GIC";

(2) The Baylor College of Medicine Retirement Plan's "fully benefit-responsive investment contract" that was guaranteed by Lincoln National;

(3) The Gemba Group Annuity Plan's synthetic GIC;

(4) The Holtzer Health System 401(a) Profit Sharing Plan's "Common collective trust";

(5) The Jackson National Life Insurance Company Defined Contribution Plan's "fully benefit-responsive investment contract that was a 'Company-sponsored' annuity . . . 'backed by the creditworthiness" of Jackson National Life Insurance;

(6) The Transamerica 401(k) Retirement Savings Plan's "fully benefit-responsive GIC with Transamerica Financial Life Insurance Company";

(7) The Valley Children's Hospital Defined Contribution Retirement Plan's "fully benefit-responsive investment contract with Lincoln National";

(8) The HCC Insurance Holdings Inc. 401(k) Plan's "fully benefit responsive guaranteed investment contract";

***Account***." *Id.* ¶¶ 15, 59 (emphases added). Plaintiffs additionally concede in their briefing that the LSA GIC is a separate account GIC. *See* Pls. Resp., ECF 25, at 25 ("Defendants plausibly failed to determine whether the LSA GIC's rate was ***commensurate with its structure as a separate account GIC***." (emphasis added)) (all citations to ECF pagination). Any remaining doubts are put to rest by reviewing the 401(a) Plan's Form 5500s Auditor's Report quoted in the FAC, which states, "Lincoln maintains the contributions ***in a separate account*** and the investment is backed by the general account of the issuing company." FAC ¶ 104 (emphasis added).

(9) The American United Life Progress Sharing Plan and Trust's "'fully benefit-responsive fixed interest investment option with the Company' that 'is maintained in the Company's general account.'";

(10) The Auto-Owners Insurance Company Retirement Savings Plan's "fully benefit-responsive investment contract" with a "wholly owned subsidiary of Auto-Owners Insurance Company";

(11) The International Imaging Materials Inc. Retirement and Investment Plan's "traditional fully benefit-responsive investment contract" offered by Lincon National;

(12) The Mattel, Inc. Personal Investment Plan's "traditional GIC"; and

(13) The Trugreen Profit Sharing and Retirement Plan's "traditional fully benefit-responsive guaranteed investment contract."

*Id.* ¶ 108; *see also id.* ¶ 112. Plaintiffs allege that from 2019 through 2023, each of these comparators outperformed the LSA GIC's crediting rate for at least one year. *See id.* ¶ 109. Plaintiffs also allege that in every year from 2019 through 2023, the comparators' average rate of return outperformed the LSA GIC's rates of return. *Id.* ¶ 110. The difference between the average rate and the LSA GIC's rate ranges from 1.53 percentage points to 2.41 percentage points. *See id.* This translates to approximately 38- to 58-percent underperformance as compared to the average. *Id.*

Aside from the named comparators, plaintiffs also allege that the LSA GIC underperformed as compared to the other GIC offered by the 403(b) Plan, Lincoln Financial Fixed Account ("LFA GIC"). *Id.* ¶ 15. And despite this underperformance, "assets of the 403(b) Plan invested in the LSA GIC were substantially higher than assets in the LFA GIC." *Id.* ¶ 116. In 2023, for example, over $90 million in 403(b) Plan assets were invested in the LSA GIC while just over $1 million in Plan assets were invested in the LFA GIC. *Id.* ¶ 62.

4. *The TRP Growth Fund*

Plaintiffs additionally allege that defendants invested significant assets from both Plans in the TRP Growth Fund and that the TRP Growth Fund significantly underperformed throughout the class period. *Id.* ¶¶ 120-21, 124, 128. In 2022, for example, the TRP Growth Fund held more than $37 million in 403(b) Plan assets and more than $9 million in 401(a) Plan Assets. *Id.* ¶¶ 120-21.

According to plaintiffs, the TRP Growth Fund underperformed compared to its own internal benchmark and against outside comparators. The Legacy Health Defined Contribution Retirement Plan Investment Policy (the "Policy") provides that the Committee "shall review the performance of investment funds' performances against the benchmark index assigned to the fund." *Id.* ¶ 124 n.15. For the TRP Growth Fund, plaintiffs allege that the benchmark is the Russell 1000 Growth Index (the "Russel 1000"). *Id.* This allegation is based on the T. Rowe Price March 1, 2025 Prospectus for Growth Stuck Fund, which plaintiffs attach to their complaint. *Id.* Ex. A. The Prospectus document contains an "Average Annual Total Returns" table which lists one "Regulator Benchmark," the Russell 3000 Index, and three "Strategy Benchmark(s)," the Russel 1000 Growth Index, the S&P 500 Index, and the Lipper Large-Cap Growth Funds Index. *Id.* Ex. A. at 9.

From 2019 through 2024, the TRP Growth Fund consistently underperformed on a three-year and five-year basis against the Russell 1000. *Id.* ¶¶ 128-31. Indeed, the TRP Growth Fund underperformed against the Russell 1000 on a five-year basis from 2015 through 2024. *Id.* ¶¶ 130-31. Plaintiffs also allege that the TFP Growth Fund underperformed against five comparators: (1) Fidelity Blue Chip Growth K; (2) Fidelity Growth Company Fund; (3) Alger Focus Equity Y; (4) JPMorgan Large Cap Growth R6; and (5) Marsico Focus Institutional. *Id.* ¶¶ 128, 130.

5. *Forfeitures*

Under the terms of the 401(a) Plan, "Forfeitures shall first be applied to restore prior forfeitures" and "[a]ny forfeitures remaining . . . shall be applied to reduce future Employer contributions or to pay plan expenses." *Id.* ¶¶ 75-76. Plaintiffs allege that, "[a]bsent any risk that Legacy would be unable to satisfy its contribution obligations, using forfeitures to pay 401(a) Plan expenses would be in the participants' best interest because that option would reduce or eliminate amounts otherwise charged to their accounts to cover such expenses," while using the forfeitures instead to reduce future employer contributions "is always in the best interest of Legacy because that option would decrease its own contribution costs." *Id.* ¶¶ 138-39. According to plaintiffs, this created a conflict of interest that defendants did not thoroughly investigate. *Id.* ¶¶ 140-41. Defendants, for example, did not (1) "investigate whether there was a risk that Legacy would

be unable to satisfy its contribution obligations if forfeitures were used to pay 401(a) Plan expenses"; (2) analyze whether the forfeitures were sufficient "to eliminate the 401(a) Plans' expenses charged to participants and still offset a portion of Legacy's own contribution obligations"; or (3) "consult with an independent, non-conflicted fiduciary or decisionmaker to advise them regarding the best course of action for allocating the forfeitures in the 401(a) Plan." *Id.* ¶¶ 142-43.

Despite this, defendants used forfeited Plan assets to reduce future contributions throughout the Class Period. *Id.* ¶ 145. Each year from 2019 through 2023, defendants used the majority of the forfeiture value to offset Legacy's contributions. *Id.* ¶ 146. In total, defendants used over $4.8 million in forfeitures to offset company contributions from 2019 through 2023. *Id.* During that same time, defendants used $0 to offset 401(a) Plan expenses, even though "Legacy had sufficient cash and equivalents on hand to satisfy its contribution obligations to the 401(a) Plan" for each of these years. *Id.* ¶¶ 146, 148.

**B. Procedural Background**

Plaintiffs initiated this putative class action on June 17, 2025, ECF 1, and filed the operative first amended complaint on October 2, 2025. *See* FAC. Plaintiffs assert claims for breach of fiduciary duty of prudence against the Committee, breach of fiduciary duty of loyalty against all defendants, breach of ERISA's anti-inurement provision against Legacy and the Board, and failure to adequately monitor other fiduciaries against the Company and the Board. *Id.* ¶¶ 150-78. All four of plaintiffs' claims are based on allegations that defendants breached their fiduciary duties as to (1) the LSA GIC; (2) the TRP Growth Fund; and (3) the use of forfeitures to offset employer contributions. *See id.*

Defendants moved to dismiss the FAC for failure to state a claim on October 31, 2025 ("Defs. Mot."), ECF 22. Plaintiffs responded in opposition on December 22, 2025, ECF 25, and defendants filed a reply on January 20, 2026, ECF 26.

Since then, both parties have filed several notices of supplemental authority.[2] Plaintiffs filed their first notice of supplemental authority on February 19, 2026, ECF 27, highlighting *Heet v. National Medical*

[2] The Court considers the cases presented but not the arguments included in these supplemental filings. *See* Local R. 7-1(e)(3) ("Unless directed by the Court, no further briefing is allowed.").

*Care, Inc.*, No. 25-cv-11644, 2026 WL 353317 (D. Mass. Feb. 9, 2026), and *Russell v. Illinois Tool Works, Inc.*, No. 22-cv-02492, 2026 WL 332662 (N.D. Ill. Feb. 9, 2026). Defendants responded on March 26, 2026, ECF 28. Defendants filed their first notice of supplemental authority on March 26, 2026, ECF 29, highlighting *Jacobs v. Hackensack Meridian Health, Inc.*, No. 25CV1272 (EP) (CF), 2026 WL 710229 (D.N.J. Mar. 13, 2026). Defendants filed their second notice of supplemental authority on April 7, 2026, ECF 30, highlighting *Shulak v. BMO Financial Corporation*, No. 25-CV-02232, 2026 WL 879652 (N.D. Ill. Mar. 30, 2026). Defendants filed their third notice of supplemental authority on May 5, 2026, ECF 31, highlighting *Eibensteiner v. EssilorLuxottica USA Inc.*, No. 3:25-v-2443-X, 2026 WL 1140895 (N.D. Tex. Apr. 27, 2026). Defendants filed their fourth notice of supplemental authority on May 29, 2026, ECF 32, highlighting *Tedford v. Equitable Financial Life Insurance Co.*, No. 25-cv-2180, 2026 WL 1398640 (D.N.J. May 19, 2026). Plaintiffs filed their second notice of supplemental authority on June 9, 2026, ECF 33, highlighting eight cases: *McGeathy v. Reinalt-Thomas Corp.*, No. CV-25-01439, 2026 WL 617343 (D. Ariz. Mar. 5, 2026); *Ang v. Franklin Res. Inc.*, No. 25-cv-06130, 2026 WL 1045698 (N.D. Cal. Apr. 17, 2026); *In re Cigna ERISA Litig.,* No. 25-cv-2465, 2026 WL 1398620 (E.D. Pa. May 19, 2026); *Sweeney v. Nationwide Mut. Ins. Co.*, No. 2:20-v-1569, 2026 WL 352845 (S.D. Ohio Feb. 9, 2026); *Fezer v. Lockheed Martin Corp.*, No. CV 25-0908, 2026 WL 1041276 (D. Md. Apr. 16, 2026); *Dayak v. Reyes Holdings, LLC*, No. 22-cv-02974, 2026 WL 881653 (N.D. Ill. Mar. 31, 2026); *Anderson v. Southwest Airlines Co.*, No. 3:25-cv-0214, 2026 WL 820860, at *1 (N.D. Tex. Mar. 25, 2026); and *Rudasill v. Swiss Re Am. Holding Corp.*, No. 25-cv-1403, 2026 WL 861676 (S.D.N.Y. Mar. 30, 2026). Defendants filed their fifth notice of supplemental authority on July 13, 2026, ECF 34, highlighting *Hensley v. Molson Coors Beverage Co. USA LLC Governance Committee*, No. 25-C-1371, 2026 WL 1878633 (E.D. Wis. Jun. 30, 2026). Defendants filed their sixth notice of supplemental authority on July 27, 2026, ECF 35, highlighting *Johnston v. Intermountain Healthcare, Inc*., No. 1:25-cv-00073-JNP-DAO, 2026 WL 1998490 (D. Utah July 10, 2026). Plaintiff filed their third notice of supplemental authority on August 28, 2026, ECF 36, highlighting five cases: *Klawonn v. Bd. of Directors for the Motion Picture Indus. Pension Plans*, No. 25-2874, 2026 WL 2364541 (9th Cir. Aug. 14, 2026); *Johnson v. Russell Inv. Mgmt*., No. 25-10692, 2026 WL 2387006 (11th

Cir. Aug. 17, 2026); *Andrews v. Wilson Elec. Servs. Corp.*, No. CV-24-00995-PHX-DJH, 2026 WL 2283444 (D. Ariz. Aug. 7, 2026); *In re UnitedHealth ERISA 401(k) Litig.*, No. 25-CV-1751 (ECT/ECW), 2026 WL 1786167 (D. Minn. June 22, 2026); *Becerra v. Bank of Am. Corp.*, No. 3:24-CV-921-MOC-DCK, 2026 WL 1917110 (W.D.N.C. Apr. 30, 2026). Defendants filed their seventh and final notice supplemental authority on August 31, 2026, ECF 37, highlighting *Farrar v. Arthur J. Gallagher (Illinois), LLC*, No. 25 C 13005, 2026 WL 2415672 (N.D. Ill. Aug. 17, 2026), and *Northcutt v. Gen Digital Inc.*, No. CV-25-02768-PHX-DWL, 2026 WL 2389356 (D. Ariz. Aug. 17, 2026).

## DISCUSSION

Plaintiffs allege that the Committee violated its duty of prudence by failing to appropriately manage the Plans' investments in the LSA GIC and TRP Growth Fund. FAC ¶¶ 150-56. Plaintiffs also allege that defendants collectively violated their duties of loyalty and prudence and breached ERISA's anti-inurement provision by mishandling forfeitures. *Id.* ¶¶ 157-71. Finally, plaintiffs allege that by way of these violations, Legacy and the Board violated their duty to adequately monitor other fiduciaries. *Id.* ¶¶ 172-78. Each is considered in turn below.

### A. Duty of Prudence as to the LSA GIC and TRP Growth Fund Investments

ERISA fiduciaries must discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B). Fiduciaries are thus required to "diversify[] the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so" and to act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provision of this subchapter…". *Id.* § 1104(a)(1)(C)-(D). This means fiduciaries must not only "exercise prudence in selecting investments at the outset," but also to continuously "monitor trust investments and remove imprudent ones." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015).

A motion to dismiss an imprudence claim "requires careful judicial consideration of whether the complaint states a claim that the defendant has acted imprudently." *Fifth Third Bancorp v. Dudenhoeffer*,

573 U.S. 409, 425 (2014). Courts "evaluate prudence prospectively, based on the methods the fiduciaries employed, rather than retrospectively, based on the results they achieved, it is not enough for a plaintiff simply to allege that the fiduciaries could have obtained better results—whether higher returns, lower risks, or reduced costs—by choosing different investments." *Anderson v. Intel Corp. Inv. Pol'y Comm.*, 137 F.4th 1015, 1021 (9th Cir. 2025), *cert. granted*, 223 L. Ed. 2d 553 (Jan. 16, 2026). This is a "context specific" inquiry that depends on the prevailing circumstances at the time of the fiduciary's actions. *Fifth Third Bancorp*, 573 U.S. at 425. Because "the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, . . . courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022).

"There are a myriad of circumstances that could violate the prudence standard. For example, a plaintiff can plead a breach of the duty of prudence by alleging facts that would directly show that the fiduciaries employed unsound methods in making their investment decisions." *Anderson*, 137 F.4th at 1021 (cleaned up). A plaintiff can also make "circumstantial factual allegations from which the court may reasonably infer from what is alleged that the process is flawed." *Id.* at 1022 (citations and quotation marks omitted). Where those circumstantial allegations "rely[] on a theory that a prudent fiduciary in like circumstances would have selected a different fund based on the cost or performance of the selected fund, that plaintiff must provide a sound basis for comparison." *Id.* (citations and quotation marks omitted). Not all circumstantial allegations must be supported with comparators. *Id.* at 1023. "But to the extent a plaintiff asks a court to infer that a fiduciary used improper methods based on the performance of the investments," the plaintiff "must compare that performance to funds or investments that are meaningfully similar." *Id.* This means that the plaintiff must plead "meaningful benchmarks" with comparable aims, risks, and potential rewards to the challenged investments. *Id.* "[S]imply labeling funds as 'comparable' or 'a peer' is insufficient to establish that those funds are meaningful benchmarks." *Id.*

1. *LSA GIC*

Plaintiffs' allegations regarding the LSA GIC are insufficient to support their claim. As an initial matter, plaintiffs do not plead any facts directly showing that defendants used unsound methods in selecting

and managing the LSA GIC. *See* FAC ¶ 91. All of plaintiffs' allegations are instead circumstantial. *See id.* ¶ 109. Plaintiffs do not deny this, but argue that their circumstantial allegations are sufficient because (1) plaintiffs are challenging defendants' investments in a GIC, which requires a different analysis than the analyses applied in mutual fund cases defendants cite; and (2) plaintiffs have alleged that the LSA GIC substantially underperformed compared to meaningful benchmarks nonetheless.

Plaintiffs first argue that the very nature of a GIC—which offers stable, predictable set returns on investments that are reviewed and reset on a regular basis—separates this case from *Anderson* and other actions that challenged mutual fund investments. *See* Pls. Resp. 24. Under this theory, plaintiffs argue that they need not plead meaningful comparators because they have alleged that defendants failed to properly negotiate and reassess the LSA GIC during its semi-annual review process. *See id.* at 24-25. This argument fails for two reasons: first, plaintiffs' process allegations are insufficient, even in the context of a GIC; and second, the Court is not persuaded that *Anderson* should not apply with equal force to GIC challenges.

Beginning with the process allegations, a GIC challenge could certainly find support in process allegations different from those used to challenge a mutual fund. Here, however, plaintiffs' process allegations are too bare to support their challenge. Plaintiffs allege that the LSA GIC's crediting rate "is reviewed on a semi- annual basis for resetting," that the GIC marketplace is "robust," and that defendants had "considerable leverage to bargain for higher crediting rates." FAC ¶¶ 104, 106, 114. But that is where the process allegations end, as plaintiffs admit that they "did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plans, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plans' investments." *Id.* ¶ 91. Merely alleging that the LSA GIC was reviewed biannually, that the GIC marketplace is robust, and that defendants had considerable leverage is not enough to sustain plaintiffs' claims. Plaintiffs' process allegations are therefore insufficient on their own. Accordingly, if *Anderson* applies, plaintiffs' LSA GIC claims may survive only if they allege that the LSA GIC underperformed as compared to meaningful benchmarks.

The Court sees no reason why *Anderson* should not apply with equal force to plaintiffs' GIC-based

challenge. None of the authority plaintiffs cite suggests that the meaningful comparator framework articulated in *Anderson* should be limited to actions challenging mutual index funds. Indeed, some of the cases plaintiffs cite expressly applied a meaningful benchmark analysis to GIC cases. For example, in *Coppel v. SeaWorld Parks & Entertainment, Inc.* ("*Coppel I*"), the Southern District of California applied a comparator analysis in finding that the plaintiffs plausibly pleaded imprudence based on the defendants' maintenance of a stable value fund that charged unreasonable fees. No. 3:21-cv-01430-RSH-DDL, 2023 WL 2942462, at *16 (S.D. Cal. Mar. 22, 2023). Setting aside that there are no similar unreasonable fee allegations here, *Coppel* does not suggest that *Anderson* is inapplicable to GIC cases. Quite the opposite—the *Coppel* court expressly credited the plaintiffs for including "two tables listing favorable crediting rates . . . offered for identical or substantially identical products." *Id.* at *17 (cleaned up). *Coppel* thus supports the application of a comparator analysis to a stable value fund. *Payne v. Hormel Foods Corporation* is similar: the District of Minnesota found that the plaintiffs had alleged "meaningful benchmarks against which to judge whether the . . . general account GIC underperformed." No. 24-CV-545 (SRN/DTS), 2024 WL 4228613, at *2 (D. Minn. Sept. 18, 2024). Again, *Payne* favors the application of *Anderson* to GIC challenges.

Although the factors that make a benchmark meaningful may differ in the context of a GIC challenge, the need to allege meaningful benchmarks remain. The viability of plaintiffs' LSA GIC claim therefore turns on whether they have alleged that the LSA GIC substantially underperformed as compared to meaningful benchmarks.

Plaintiffs have failed to provide such allegations here. As plaintiffs allege, not all GICs are alike. *See* FAC ¶ 99. General account GICs are the riskiest, synthetic account GICs are the least risky, and separate account GICs fall in the middle. *Id.* ¶¶ 99-101. The LSA GIC is a separate account GIC. However, plaintiffs do not sufficiently allege that the LSA GIC underperformed compared to any other separate account GIC. *See* FAC ¶¶ 108-09. Plaintiffs allege that two comparators—the Pomona Valley Hospital Medical Center Retirement Savings Plan and the Gemba Group Annuity Plan—are "synthetic GICs," and thus less risky than the LSA GIC. *See id.* Plaintiffs also argue in their opposition that a third comparator,

the Jackson National Life Insurance Company Defined Contribution Plan, is a separate account GIC. *See* Pls. Resp. 14. However, defendants have provided Form 5500s showing that each is in fact a general account GIC.[3] *See* Defs. Exs. C, D, I. Since plaintiffs do not allege that the LSA GIC underperformed against any other synthetic GIC (or even a less risky separate account GIC), they do not sufficiently allege that the LSA GIC underperformed against a meaningful benchmark.

Despite these differences, plaintiffs maintain that their claims should go forward because all forms of GICs can serve as meaningful benchmarks to each other so long as they bear similar risk profiles and objectives. *See* Pls. Resp. 26-27. But according to the first amended complaint, these comparators do not share similar risk profiles or objectives. By plaintiffs' own allegations, the risk profile associated with a given GIC is dependent on the GIC's structure. *See, e.g.*, FAC ¶ 101. Plaintiffs cite to *Ellis v. Fidelity Management Trust Company* to argue that the First Circuit has found that all stable value funds share "typical features . . . [that] are salient here." 883 F.3d 1, 3 (1st Cir. 2018). *Ellis* described these features as (1) "consist[ing] of an underlying portfolio of highly-qualified, diversified, fixed-income securities"; (2) "utiliz[ing] a 'crediting rate' that takes into account gains and losses over time and determines what amount of interest will be credited to investors, and at what intervals this will occur"; and (3) "utiliz[ing] 'wrap insurance,' a form of insurance providing that, subject to exclusions, when a stable value fund is depleted such that investors cannot all recover book value, the insurance provider will cover the difference." *Id.* Plaintiffs allege, however, that the number of "wrap providers" varies by the GIC type and that this variance results in varying crediting rates. *See* FAC ¶¶ 99-101. *Ellis* therefore did not address a situation like the one encountered here. If anything, *Ellis* supports a finding that the number of wrap providers is important in assessing alleged comparators.

---

[3] The Court may consider these documents under the doctrines of incorporation by reference and judicial notice. All the Form 5500s at issue are referenced in the first amended complaint, central to plaintiffs' claims, and unchallenged by plaintiffs. These documents are therefore incorporated by reference into the first amended complaint. *See Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006). Additionally, Form 5500s "are matters of public record not subject to reasonable dispute and of which courts . . . routinely take judicial notice." *Hutchins v. HP Inc.*, 767 F. Supp. 3d 912, 920 (N.D. Cal. 2025). The Court may therefore consider these documents under either doctrine.

Indeed, a later-published order in one of plaintiff's cited cases, C*oppel v. SeaWorld Parks & Entertainment, Inc.*, addressed this very situation and found in the defendant's favor on the issue. No. 21-cv-01430, 2024 WL 3086702 (S.D. Cal. Jan. 31, 2024) ("*Coppel II*"). In *Coppel II*, the plaintiffs challenged a separate account fund, which they attempted to compare against a general account fund. *Id.* at *15. The *Coppel II* court found that the general account fund could not "typically serve as a meaningful benchmark for the . . . separate account" because the plaintiffs alleged that general account GICs were riskier than their counterparts. *Id.* Thus, the court found that the plaintiffs failed "to plead a meaningful benchmark" and accordingly "fail[ed] to state a claim for imprudent retention. . . based on underperformance." *Id.* at 16. While the court let the claim move forward based on other theories, including the use of excessive fees and the failure to diversify, plaintiffs do not offer similar allegations here sufficient to sustain their claim. Because plaintiffs do not allege that any of their chosen comparators are the same form of GIC as the LSA GIC, they have not adequately plead underperformance against these comparators.

Plaintiffs' final argument on this point is that the Court can nonetheless compare the LSA GIFC against the Plans' own investments in the LFA GCI. However, plaintiffs' only allegations as to the similarities between the LSA GIC and LFA GIC are that both are offered by Lincoln. That is not enough to render the LFA GIC a meaningful benchmark. And "simply labeling [GICs] as comparable or a peer is insufficient to establish that those [GICs] are meaningful benchmarks against which to compare the performance of the" LSA GIC. *Anderson*, 137 F.4th at 1023 (citation and quotation marks omitted). Without meaningful benchmarks, the Court does not reach the question of whether the LSA GIC sufficiently underperformed against the alleged comparators. Therefore, Plaintiffs' LSA GIC claims are dismissed.

2. *TRP Growth Fund*

While the TRP Growth Fund presents a closer question, plaintiffs' allegations fall short of meeting the plausibility threshold. Plaintiffs compare the TRP Growth Fund to its benchmark index, the Russell 1000 Growth Index, as well as five alleged benchmarks: Fidelity Blue Chip Growth K, Fidelity Growth Company Fund, Alger Focus Equity Y, JPMorgan Large Cap Growth R6, and Marsico Focus Institutional.

FAC ¶¶ 124 n.15, 128. Most of plaintiffs' arguments focus on the Russel 1000 Growth Index. *See* Pls. Resp. 19-22.

Plaintiffs cite numerous cases in which they argue that courts found imprudence where the challenged plan underperformed against its internal benchmarks. But in those cases, the courts did not find imprudence based on underperformance alone. In *Thomson v. Caesars Holdings Inc.*, the plan did indeed underperform against its own internal benchmarks—which were custom-made to assess the plan's performance—as well as comparable options, the fund's prior year performances, and the S&P Target Date index. 661 F. Supp. 3d 1043, 1051, 1057 (D. Nev. 2023). However, the investment at issue in *Thomson* was to a fund that the defendant itself owned, and the plaintiffs alleged that "at the time [the defendant] made its decision to switch the Plan's assets to its own aged-based funds, the prior Plan funds were outperforming the [challenged] funds" for several years and over the life cycles of the funds. *Id.* at 1056. Accordingly, the *Thomson* court found plausible that the defendant "acted imprudently by investing Plan assets into its own funds over objectively better alternatives." *Id.* at 1058.

The plaintiffs in *Baird v. BlackRock Institutional Trust Company* similarly alleged that the defendant improperly favored defendant-affiliated funds. 403 F. Supp. 3d 765, 779 (N.D. Cal. 2019). The plaintiffs alleged that, "in contravention of the IPS, the BlackRock Defendants diverted hundreds of millions of dollars from the Plan's assets to seed newly-launched BlackRock funds, . . . even though those funds did not have the required performance history of three years." *Id.* at 780. And while the *Baird* court did consider the underperformance compared to benchmark indices, it also compared the funds to "nearly identical BlackRock funds," and noted that the variance was due to "undisclosed fees and layering structure[s] that make the [challenged] funds disadvantageous for BlackRock Plan participants and highly profitable for BlackRock." *Id.* Once again, the plaintiffs alleged far more than mere underperformance.

In *Macias v. Sisters of Charity of Leavenworth Health System*, the plaintiffs alleged certain process-based allegations alongside the underperformance claims. No. 23-cv-01496-LTB-SBP, 2025 WL 4038011 (D. Colo. July 24, 2025). The plaintiffs argued that the defendants failed to follow the IPS's review criteria, which required a "yearly comparison" to the identified benchmarks. *Id.* at 7. Because of this, the court

found that the plaintiffs had "identified a specific requirement [under the IPS] that they allege[d] Defendants failed to satisfy." *Id.* Here, plaintiffs merely allege that the policy "states that the Committee shall review the performance of investment funds' performances against the benchmark index assigned to the fund" that the assigned index is the "Russell 1000 growth Index" and that, generally, defendants failed "to objectively and adequately review the Plans." FAC ¶¶ 20, 124 n.15. Plaintiffs do not allege that defendants failed to conduct this review—indeed, plaintiffs allege only that this "data was publicly available to the Committee at the time of their decision-making, whether they reviewed the funds annually or quarterly (if at all)." *Id.* ¶ 133.

The closest case is *Coppel I*, where the court did find that the fund's "own 'primary prospectus benchmark'" served as a meaningful benchmark. 2023 WL 2942462, at *17. In a later opinion, however, the *Coppel II* court found that it was this underperformance alongside "other indicia of imprudence" that rendered plaintiffs' claims plausible. 2024 WL 3086702, at *13. The plaintiffs alleged in *Coppel II* that the defendants "selected higher cost share classes for nearly 90% of the mutual funds offered in the Plan, which did not perform as well as lower cost share classes . . . but instead benefitted the Plan's recordkeeper and other service providers" and that the defendants "imprudently selected and monitored the Plan's service providers by failing to competitively bid the Plan's service providers, failing to negotiate lower fees, and paying unreasonably excessive fees compared to similar sized plans." *Id.* "Taken together," the court found that the imprudence claim had been sufficiently pleaded. *Id.*

Similarly, in *Valenzuela v. Advantage Sales & Marketing, LLC*, the court found that "the inference that there was a flawed process [was] reasonable based on the allegations that the process in place allowed for excessive recordkeeping fees and the retention of underperforming funds." No. 24-cv-00460, 2024 WL 5316279, at *6 (C.D. Cal. Nov. 18, 2024). While it is true that the court credited the plaintiffs' allegations of "consistent and significant underperformance relative to its benchmark, the Russel 1000 Growth index," as well as underperformance compared to "its peer group," the court also looked to allegations regarding excessive fees. *Id.* at 5-6. The plaintiffs "allege[d] facts regarding a fee differential in the recordkeeping and administrative fees, as well as specific examples of the Franklin Fund underperforming compared to

its benchmarks." *Id.* The court did not rely on underperformance alone.

What these cases show is that underperformance against an internal benchmark may support a finding of imprudence when combined with something more. *See also Bracalente v. Cisco Sys.*, Inc., No. 5:22-cv-04417-EJD, 2023 WL 5184138, at *4-5 (N.D. Cal. Aug. 11, 2023) ("[T]he Court cannot reasonably infer from underperformance alone that the BlackRock TDFs were imprudent investments" because this "'underperformance-only' theory . . . would flatten this nuanced prudence evaluation into a one-dimensional comparison that considers only the funds' three-and-five-year performance data") (collecting cases). Standing alone, underperformance allegations against a chosen benchmark are insufficient. And here, the underperformance allegations stand largely alone. Plaintiffs do not allege that defendants owned the TRP Growth Fund or that they invested in the TRP Growth Fund to benefit themselves or anyone else at the expense of plan participants. *Compare* FAC ¶ 17 (alleging that "Lincoln benefited significantly from participants in the Plans investing in the LSA GIC" because "investments in the LSA GIC were held and invested by Lincoln, which kept the spread") *with id.* ¶ 18 (alleging that defendants "selected and failed to remove the underperforming [TRP Growth Fund] whose investment returns significantly underperformed relevant benchmarks"). Nor do plaintiffs allege that defendants violated a specific Policy requirement or that the TRP Growth Fund charged excessive fees. All that plaintiffs allege is that the TRP Growth Fund underperformed against one internal benchmark—out of four listed benchmarks in the attached Prospectus document—and five external comparators. *See id.* Ex A at 9.

As to the five other funds plaintiffs plead as comparators, none are sufficiently alleged as benchmarks. Indeed, plaintiffs do not provide any information about any of the five funds beyond their names and rates. *See* FAC ¶¶ 128, 130. In their response, plaintiffs state that each comparator uses the Russell Index as a benchmark. *See* Pl. Resp. 12 n.2. But that is not alleged in the complaint and, even if it were, sharing a benchmark does not equate to sharing aims, risks, and potential rewards. *See Anderson*, 137 F.4th at 1023. Accordingly, plaintiffs' TRP Growth Fund claims are dismissed.

**B. Duties of Loyalty and Prudence as to Forfeitures**

Plaintiffs' remaining challenges concern defendants' use of Plan forfeitures to offset future

employer contributions instead of plan expenses. In addition to alleging a breach of the duty of prudence, plaintiffs contend that defendants violated their duty of loyalty and ERISA's anti-inurement provision through their handling of said forfeitures. The Court first addresses plaintiffs' allegations concerning defendants' duties of loyalty and prudence.

To fulfill the duty of loyalty, an ERISA plan fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). However, "ERISA 'does not create an exclusive duty to maximize pecuniary benefits.'" *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1100 (9th Cir. 2004) (quoting *Collins v. Pension & Ins. Comm. of So. Cal. Rock Prods. & Ready Mixed Concrete Ass'ns*, 144 F.3d 1279, 1282 (9th Cir. 1998) (per curiam)). Indeed, "ERISA does no more than protect the benefits which are due to an employee under a plan." *Id.* (quoting *Bennett v. Conrail Matched Sav. Plan Admin. Comm.*, 168 F.3d 671, 677 (3d Cir. 1999)). "The duty to act in accordance with the plan document does not . . . require a fiduciary to resolve every issue of interpretation in favor of plan beneficiaries." *Collins*, 144 F.3d at 1282. Fiduciaries need not "resolve every issue of interpretation in favor of plan beneficiaries" and they are not legally obligated to deviate from the plan's terms. *Wright*, 360 F.3d at 1100 (quoting *Collins*, 144 F.3d at 1282. "The plan, in short, is at the center of ERISA." *U.S. Airways, Inc. v. McCutchen*, 569 U.S. 88, 101 (2013).

The Plan's forfeiture requirements are uncontested. The Plan provides that "[a]ny forfeitures remaining . . . shall be applied to reduce future Employer contributions or to pay plan expenses." FAC ¶ 76 (citation and quotation marks omitted). It is also uncontested that defendants followed this requirement by applying forfeitures to reduce future employer contributions. *See* FAC ¶¶ 140, 146 (showing most forfeitures were allocated to offset Company contributions and no forfeitures were allocated to offset plan expenses from 2019 through 2023). Nonetheless, what plaintiffs contest is whether defendants violated their fiduciary duties by choosing to apply forfeitures *exclusively* to reduce future employer contributions and *never* to pay plan expenses.

According to plaintiffs, "[u]sing the forfeitures to reduce Company contributions is always in the best interest of Legacy because that option would decrease its own contribution costs," while using forfeitures to pay administrative expenses "would be in the participants' best interest because that option would reduce or eliminate amounts otherwise charged to their accounts to cover such expenses" so long as there was no risk that Legacy "would be unable to satisfy its contribution obligations." *Id.* ¶¶ 138-39. Plaintiffs thus allege that defendants faced a conflict of interest in determining how to apply forfeitures and that, despite this conflict, "[d]efendants failed to undertake any investigation into which option was in the best interest" of the Plan participants. *Id.* ¶ 141. Defendants did not, for example "consult with an independent, non-conflicted fiduciary or decisionmaker to advise them regarding the best course of action" and did not "investigate whether there was a risk that Legacy would be unable to satisfy its contribution obligations if forfeitures were used to pay 401(a) Plan Expenses" or "whether there were sufficient forfeitures to eliminate the 401(a) Plan's expenses charged to participants and still offset a portion of Legacy's own contribution obligations. *Id.* ¶¶ 141-43. Plaintiffs thus allege that defendants' decision to apply forfeitures only to offset future employment contributions was motivated by self-interest, in breach of defendants' duty to manage the "Plan's assets solely in the interest of participants." *Id.* ¶ 144.

Many courts within this Circuit and throughout the country have addressed this argument, and the vast majority have found it "fails because it contravenes ERISA and decades of settled precedent" and because "it would create benefits beyond those promised in the Plan." *Hernandez v. AT&T Servs., Inc.*, No. 2:25-cv-00676-ODW (PVCx), 2025 WL 3208360, at *4 (C.D. Cal. Nov. 14, 2025) (citation omitted); *see also Polanco v. WPP Grp. USA, Inc.*, No. 24-cv-9548 (JGK), 2025 WL 3003060, at *4 (S.D.N.Y. Oct. 27, 2025) ("As nearly every court to address this question has concluded, when (1) a plan document gives a plan fiduciary discretion in how to use forfeitures and (2) participants otherwise receive everything guaranteed by the plan's terms, plan fiduciaries do not violate their duty of loyalty merely by declining to use forfeitures to cover administrative expenses."). Within this Circuit, the seminal case is *Hutchins v. HP Inc.*, which is currently pending before the Ninth Circuit. 767 F. Supp. 3d 912, 925 (N.D. Cal. 2025) ("*Hutchins II*"), *appeal docketed* No. 25-826. In *Hutchins II*, a Northern District of California court

dismissed an amended class action complaint that brought a similar forfeiture allocation challenge. After reviewing long-standing Treasury Department reports and regulations, as well as modern proposed clarifications, settled law, and Supreme Court precedent—many of which defendants include in their briefing here—the *Hutchins II* court found that the plaintiffs' theory would contravene "long-settled rules regarding the use of forfeitures in defined contribution plans." *Id.* at 922-923; *see also Hutchins v. HP Inc.*, 737 F. Supp. 3d 851, 859 (N.D. Cal. 2024) ("*Hutchins I*") (explaining how the Treasury Department regulations may be deemed persuasive authority). As the court explained, "Plaintiff's claim is that the fiduciary duty provisions create an unqualified duty to pay administrative costs—that is, to maximize pecuniary benefits in favor of plan beneficiaries. But it is neither disloyal nor imprudent under ERISA to fail to maximize pecuniary benefits." *Id.* at 863.

Plaintiffs raise two primary arguments as to why this Court should come out differently. First, plaintiffs argue that this Court should reject the majority view discussed in *Hutchins II* and instead follow a minority of courts that have found for the plaintiffs on this argument. Second, plaintiffs argue that this case is distinguishable from *Hutchins II* because plaintiffs do not seek a categorical rule here requiring defendants to use forfeitures to pay plan expenses.

Beginning with the minority view, reasonable courts have indeed disagreed on this issue, and it is not obvious that either view is necessarily correct. For example, another recent pair of Northern District of California cases found in favor of the plaintiffs. *See McManus v. Clorox Co.*, No. 4:23-cv-05325-YGR, 2024 WL 4944363 (N.D. Cal. Nov. 1, 2024) ("*McManus I*"); *McManus v. Clorox Co.*, No. 4:23-cv-05325-YGR, 2025 WL 732087 (N.D. Cal. Mar. 3, 2025) ("*McManus II*"). In *McManus I*, the court dismissed the plaintiffs' initial complaint because the plaintiffs' theory was "impermissibly broad." 2025 WL 732087, at *6. The plaintiffs asserted "that it is necessarily a fiduciary breach to use participant money to pay administrative costs instead of forfeited amounts," which the court found ran afoul of the Supreme Court's guidance that "inquiries into fiduciary breaches are 'context specific.'" *Id.* (citation omitted). The *McManus I* court dismissed with leave to amend, thus leading to *McManus II*.

In *McManus II*, the court denied the defendants' motion to dismiss the plaintiffs' newly amended

complaint because it found the amended allegations "sufficiently context-specific." 2025 WL 732087, at *5. The plaintiffs alleged "that defendants, when acting as fiduciaries by choosing how to allocate forfeited money in the Plan, made the imprudent decision of using the money to offset [the company's] contributions instead of saving plan participants the cost of administrative fees," and that the defendants "had a conflict of interest and were motivated primarily or exclusively by [the company's] own self-interest rather than the interest of the Plan's participants and beneficiaries, which Defendants failed to consider," which the court found to be "sufficiently specific, and therefore plausible for plaintiff's claim because defendants . . . had enough information to know whether their decision was prudent when making a fiduciary decision." *Id.* at *2, *5. The plaintiffs also identified "at least one circumstance in which defendants' actions would not be predetermined," namely, when the company "might not be able to not satisfy its contribution obligations if forfeitures were used to pay Plan expenses." *Id.* at *5 n.8. The defendants' actions were thus "not always predetermined" and, as such, required "some process or disinterested decision-maker to decide how to use forfeitures." *Id.* Several other courts have ruled similarly. *See, e.g.*, *Buescher v. N. Am. Lighting, Inc.*, 791 F. Supp. 3d 873, 890 (C.D. Ill. 2025); *Rodriguez v. Intuit Inc.*, 744 F. Supp. 3d 935, 944 (N.D. Cal. 2024); *Heet v. Nat'l Med. Care, Inc*., 819 F. Supp. 3d 63, 69-71 (D. Mass. 2026) (collecting cases that follow each view).

This Court agrees with much of the reasoning in *McManus II*, but does not find that it commands the same outcome here. Since fiduciaries must act in the participants' best interests, it stands to reason that a fiduciary could violate its duties by acting instead out of self-interest, even if the plan documents allow the fiduciary to make that seemingly self-interested decision. This is precisely what the *McManus II* court found: that the plaintiffs' allegations that the defendants "were motivated solely by self-interest and conducted no reasoned and impartial decision-making process [was] plausible given that no other justification [was] readily apparent" and that the court could therefore infer liability based on the defendants' "motivation . . . and the thoroughness of [their] investigation." 2025 WL 732087, at *4. But as the *McManus II* court admitted, the allegations before it were "sparse." *Id.* at *4. Here, this Court finds the allegations before it too sparse to withstand defendants' challenge. Which leads to plaintiffs' second

argument: that their allegations are context-specific and do not command the application of any categorical rule.

Plaintiffs argue that they are not advocating for a per se rule, but only asking the Court to find that defendants violated their duties based on the specific facts alleged. However, the facts alleged are far from specific. Plaintiffs allege the following:

(1) "Using the forfeitures to reduce Company contributions is always in the best interest of Legacy because that option would decrease its own contribution costs";

(2) "Absent any risk that Legacy would be unable to satisfy its contribution obligations, using forfeitures to pay 401(a) Plan expenses would be in the participants' best interest because that option would reduce or eliminate amounts otherwise charged to their accounts to cover such expenses";

(3) "In deciding between using forfeitures to benefit the Company or using forfeitures to benefit the participants, Defendants are presented with a conflict of interest in administering the 401(a) Plan and managing and disposing of the 401(a) Plan assets";

(4) "Despite the conflict of interest presented by this decision, Defendants failed to undertake any investigation into which option was in the best interest of the 401(a) Plan's participants and beneficiaries";

(5) "Defendants did not, for example, investigate whether there was a risk that Legacy would be unable to satisfy its contribution obligations if forfeitures were used to pay 401(a) Plan expenses";

(6) Defendants did not "evaluate whether there were sufficient forfeitures to eliminate the 401(a) Plan's expenses charged to participants and still offset a portion of Legacy's own contribution obligations";

(7) "Defendants also failed to consult with an independent, non-conflicted fiduciary or decisionmaker to advise them regarding the best course of action for allocating the forfeitures in the 401(a) Plan";

(8) "For each year during the Class Period, Legacy had sufficient cash and equivalents on hand to satisfy its contribution obligations to the 401(a) Plan";

(9) "Since at least the beginning of the Class Period, Defendants have improperly used forfeited non-vested Plan assets for the Company's own benefit to reduce future Company contributions instead of

using the funds to benefit 401(a) Plan participants"; and that

(10) "Defendants consistently based the decision of how to allocate forfeitures solely on Legacy's own self-interests and failed to consider the interests of the 401(a) Plan and its participants." FAC ¶¶ 136-48.

Many of these allegations are conclusory. The only allegations that are sufficiently specific are that Legacy had sufficient funds to satisfy its contribution obligations, that defendants did not investigate whether Legacy would be unable to satisfy these obligations if it used forfeitures to pay plan expenses, and that defendants did not consult with an independent decision maker. Plaintiffs do not allege that they ever received less benefits than they were owed or any facts supporting their assertion that defendants were motivated entirely by self-interest. Stripped of conclusory allegations, what effectively remains is that defendants used forfeitures to offset future company contributions despite Legacy's financial ability to pay contributions and without consulting a neutral decision maker. While that does not present the same categorical rule that the *Hutchins II* court rejected, the logical conclusion of plaintiff's argument is still a categorical rule—that forfeitures must be used to offset administrative expenses whenever the company is financially able to do so. Though that is not quite the same as arguing that fiduciaries must always choose to pay administrative costs, it still "is not limited to any particular circumstances that may be present in this case." *Hutchins II*, 737 F. Supp. 3d at 862-63 ("Because Plaintiff's claims are so broad, he is effectively arguing that the fiduciary duties of loyalty and prudence create a benefit: the payment of his administrative costs. However, the Plan does not provide any such benefit, and Plaintiff does not allege any facts showing that he is entitled to such a benefit."). It therefore runs into the same issues as the broader theory rejected in *Hutchins II*, leaving a rule that "improperly extend ERISA beyond its bounds" and effectively "create[s] a benefit: the payment of [] administrative costs." *Id.*

In view of the persuasive regulatory and binding Supreme Court authority discussed in the *Hutchins* cases, this Court finds that the rule for which plaintiffs advocate is still too broad. While there certainly may be instances where a plaintiff alleges enough to show that a defendant breached its duties by choosing to allocate forfeitures to offset company expenses under the specified circumstances, plaintiffs here have

not met that bar. Accordingly, plaintiffs' fiduciary duty claims based on the handling of forfeitures are dismissed.

**C. Anti-Inurement**

Plaintiffs' anti-inurement claim must be dismissed as well. ERISA's anti-inurement provision states that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1103(c)(1). This provision "demands only that plan assets be held for supplying benefits to plan participants." *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 22 (2004). Its exclusive focus is "on whether fund assets [are] used to pay pension benefits to plan participants." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 442 (1999).

Plaintiffs allege that defendants violated this provision by applying forfeitures to offset future employer contributions. Like plaintiffs' other forfeiture claims, this argument has also become common in recent years. And like plaintiffs' other forfeiture claims, most courts that have addressed this argument have found in favor of the defendants. *See, e.g.*, *Steen v. Sonoco Prods. Co.*, No. 4:24-cv-03105-JD, 2025 WL 2420725, at *6 (D.S.C. June 4, 2025) ("[C]ourts have repeatedly held that the internal reallocation of forfeited contributions within a plan, when conducted in accordance with plan terms, does not violate the anti-inurement provision because the assets remain inside the plan and continue to serve the interests of participants." (collecting cases)). Plaintiffs do not allege that any of the forfeitures at issue ever left the plan or were used for any purpose other than to pay benefits to plan participants. This Court therefore joins the majority view in rejecting plaintiffs' anti-inurement argument. Accordingly, plaintiffs' anti-inurement claims are dismissed.

**D. Duty to Monitor**

Finally, plaintiffs' duty to monitor claims are derivative of plaintiffs' duty of prudence claims. *See Hutchins I*, 737 F. Supp. 3d at 869; Pl. Resp. 43. Because plaintiffs' duty of prudence claims are dismissed, so too are plaintiffs' claims arising out of defendants' duty to monitor.

## CONCLUSION

For the reasons stated herein, defendant's motion is GRANTED, and the first amended complaint is DISMISSED with leave to amend. If plaintiffs wish to file a second amended complaint, they must do so within thirty (30) days.

IT IS SO ORDERED.

DATED this 30th day of September, 2026.

Adrienne E Nelson

Adrienne Nelson
United States District Judge